**TIME WARNER ENTERTAINMENT CO., L.P., et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents,**

Nynex Corporation, et al., Intervenors.

Nos. 93–1723, 93–1727, 93–1729, 93–1730, 94–1066, 94–1354, 94–1355, 94–1366, 94–1367, 94–1375–94–1378, 94–1380, 94–1382, 94–1400, 94–1401, 94–1407, 94–1408, 94–1432–94–1438, 94–1440–94–1442, 94–1444, 94–1445 and 94–1448.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 20, 1994.

Decided June 6, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied July 17, 1995.*

---

* Wald, Henderson and Tatel, Circuit Judges, did not participate in this matter.

H. Bartow Farr, III, argued the cause, for petitioner Nat. Cable Television Ass'n, Inc. With him on the briefs were Richard G. Taranto, Daniel L. Brenner, Neal M. Goldberg and Diane B. Burstein.

Stuart W. Gold, argued the cause, for petitioner Time Warner Entertainment Co., L.P. With him on the briefs were Robert D. Joffe, Edward J. Weiss, Eric H. Jaso, Brian Conboy, Theodore Case Whitehouse, Francis M. Buono, Aaron I. Fleischman, R. Bruce Beckner and Jill Kleppe McClelland. Arthur H. Harding entered an appearance for Time Warner Entertainment Co., L.P.

Frederick E. Ellrod, III, argued the cause, for petitioners City of Austin, TX, City of Dayton, OH, City of Dubuque, IA, King County, WA, Miami Valley Cable Council, Montgomery County, MD, St. Louis, MO and City of Wadsworth, OH. With him on the briefs was Joseph Van Eaton. Lisa S. Gelb and Nicholas P. Miller entered an appearance.

David O. Bickart, argued the cause, for petitioner Blade Communications, Inc. With him on the briefs were Terrence B. Adamson, Irving Gastfreund, Gary Thompson and Fritz Byers.

Brenda L. Fox and Michael S. Schooler were on the briefs, for petitioners Cable Telecommunications Ass'n, Comcast Cable Communications, Inc., Cox Cable Communications, Inc., Cablevision Industries Corp. and Newhouse Broadcasting Corp. J. Christopher Redding and Peter H. Feinberg entered appearances, for Comcast Corp. and Cablevision Industries Corp. Stephen R. Effros, James H. Ewalt and Robert Ungar were on the briefs, for petitioner Cable Telecommunications Ass'n. Frank W. Lloyd, III and Peter Kimm, Jr. entered appearances, for Cable Telecommunications Ass'n. Lex J. Smith, Joel Nomkin and Charles A. Blanchard were on the briefs, for petitioner Century Communications Corp. Stephen R. Ross and Kathryn A. Hutton were on the briefs, for petitioner Armstrong Holdings, Inc. John P. Cole, Jr., and Paul Glist were on the briefs, for petitioners Benchmark Communications, L.P., Columbia Associates, L.P., Daniels Cablevision, Inc., Greater Media, Inc., McDonald Investment Co., Inc., Prime Cable Corp., Telecable Corp., United Video Cablevision, Inc. and Western Communication. Gardner F. Gillespie, David G. Leitch and James J. Moor were on the briefs, for petitioners C–TEC Cable Systems, Inc., Horizon Cable I, L.P., Clinton Cable, L.P., Harron Communications Corp., the Coalition of Small System Operators, Prime Cable Corp., Douglas Communications Corp. II, Wometco Cable Corp., Georgia Cable Partners and Atlanta Cable Partners, L.P.

Christopher J. Wright, Deputy Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Laurence N. Bourne, Counsel, F.C.C., argued the cause, for respondents. With them on the briefs were William E. Kennard, Gen. Counsel, Carl D. Lawson, C. Grey Pash, Jr., James M. Carr and Aliza F. Katz, Counsel, F.C.C., Anne K. Bingaman, Asst. Atty. Gen., Catherine G. O'Sullivan and Nancy C. Garrison, Attys., U.S. Dept. of Justice. Renee Licht, Counsel, F.C.C. entered an appearance. Robert B. Nicholson and Robert J. Wiggers, Attys., U.S. Dept. of Justice, entered appearances.

Laurence H. Tribe, Jonathan S. Massey, Edward D. Young, III and Michael E. Glover were on the briefs, for intervenor Bell Atlantic. John Thorne entered an appearance for intervenor Bell Atlantic. Ward W. Wueste, Jr. and John F. Raposa were on the briefs, for intervenor GTE Service Corp. James R. Hobson, Gail L. Polivy and Jeffrey O. Moreno entered appearances, for intervenor GTE Service Corp. Thomas J. Tallerico and Eric E. Breisach were on the briefs, for intervenor Small Cable Business Ass'n. Richard Blumenthal, William B. Gundling, Jane R. Rosenberg and Stephen R. Park were on the briefs, for intervenor Atty. Gen. of the State of Conn. Bradley Stillman was on the briefs, for intervenor Consumer Federation of America.

Shelley E. Harms entered an appearance, for intervenor Nynex Corp. Matthew R. Sutherland entered an appearance, for intervenor BellSouth Telecommunications, Inc. Gary M. Epstein entered an appearance, for intervenor DirecTv, Inc. Larry S. Solomon entered an appearance, for intervenor Liberty Cable Co., Inc. Robert A. Garrett entered an appearance, for intervenor Nat. Ass'n of Telecommunications Officers and Advisors. Howard J. Barr entered an appearance, for intervenor Service Electric Cable TV of New Jersey.

Before GINSBURG, RANDOLPH, and ROGERS, Circuit Judges.

Statement for the Court filed PER CURIAM.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion for the Court filed by Circuit Judge ROGERS.

Opinion dissenting in part filed by Circuit Judge RANDOLPH.

PER CURIAM.

In these consolidated cases, various cable companies and municipalities petition for review of several orders of the Federal Communications Commission implementing the Cable Television Consumer Protection And Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460 (codified in scattered sections of 47 U.S.C.). We are issuing three separate opinions, each addressing a distinct category of issues. In the opinion for the court authored by Judge GINSBURG, we address what the parties call the "rate issues," various challenges brought under the 1992 Cable Act and the Administrative Procedure Act to certain FCC decisions concerning the rates that regulated cable companies may charge. In the opinion for the court authored by Judge RANDOLPH, we consider the claim of various cable companies that the FCC, in implementing the Cable Act, violated the First Amendment to the United States Constitution. Finally, in the opinion for the court authored by Judge ROGERS we review what the parties call the "rules issues," various claims made by cable companies and a group of cities concerning the scope of the FCC's cable regulations and the role of local governments in regulating cable.

GINSBURG, Circuit Judge:

In addressing the "rate issues," we consider challenges made by a group of cable companies, by a group of cities, and by Blade Communications, Inc., an individual cable company. Put simply, the cable petitioners argue that the FCC's new ratemaking regime results in rates that are too low and that it should be set aside both because it violates the 1992 Cable Act and because it is arbitrary and capricious in violation of the Administrative Procedure Act. Blade Com-

munications argues more specifically that the Commission's rules improperly penalize it for having had rates that were lower than those charged by most cable systems prior to the imposition of controls. The cities argue that other aspects of the ratemaking regime run afoul both of the 1992 Cable Act and of the APA; generally, they ask us to set aside those parts of the FCC's rules that they claim permit cable companies to charge unlawfully high rates.

We hold that, with one exception, the Commission struck an appropriate balance between the competing interests of the cable companies and their subscribers, in violation neither of the 1992 Cable Act nor of the APA. The one exception is the Commission's treatment of so-called gap-period external costs; on that issue, we grant the cable companies' petition and vacate the rule.

## I. BACKGROUND

Under the Cable Act of 1992, any cable system that does not face "effective competition," as defined in the Act, is subject to rate regulation. 47 U.S.C. § 543(a)(2). The definition of effective competition includes three types of situations, to wit:

(A) fewer than 30 percent of the households in the franchise area subscribe to the cable service of a cable system;

(B) the franchise area is—

(i) served by at least two unaffiliated multichannel video programming distributors each of which offers comparable video programming to at least 50 percent of the households in the franchise area; and

(ii) the number of households subscribing to programming services offered by multichannel video programming distributors other than the largest multichannel video programming distributor exceeds 15 percent of the households in the franchise area; or

(C) a multichannel video programming distributor operated by the franchising authority for that franchise area offers video programming to at least 50 percent of the households in that franchise area.

47 U.S.C. § 543($l$)(1). Only a cable system that finds itself in one of those three situations, which the Commission calls respectively a "low penetration system," an "overbuild," and a "municipal system," is exempt from rate regulation. 47 U.S.C. § 543(a)(2).

The Act divides the cable services of a system that is subject to rate regulation into three categories: (1) the basic service tier; (2) cable programming service; and (3) video programming offered on a per channel or per program basis, which alone is not subject to rate regulation. 47 U.S.C. §§ 543(a)(1), ($l$)(2). The basic service tier includes local broadcast channels; those non-commercial public, educational, and government-access channels that the cable system is required by its franchise to carry; and such additional channels as the cable operator may in its discretion include in this tier. 47 U.S.C. § 543(b)(7). The Act provides that a cable subscriber must purchase the basic service tier in order to gain access to other service tiers, 47 U.S.C. § 543(b)(7), and instructs the Commission to establish regulations that "ensure that the rates for the basic service tier are reasonable[,]" and are "designed to achieve the goal of protecting subscribers ... from rates ... that exceed the rates that would be charged for the basic service tier if such cable system were subject to effective competition." 47 U.S.C. § 543(b)(1). Each local franchising authority that has been certified by the FCC may enforce the FCC's basic service tier rate regulations within its franchise area. 47 U.S.C. §§ 543(a)(2)–(6).

Cable programming service includes all cable channels that are neither part of the cable system's basic tier offering nor offered on a per channel or per program basis. 47 U.S.C. § 543($l$)(2). The Act charges the Commission (rather than local franchising authorities) with enforcement of the rate regulations for cable programming service, 47 U.S.C. § 543(a)(2)(B); the Commission must establish criteria to identify and create procedures for lowering any "unreasonable" rate for cable programming service. 47 U.S.C. § 543(c)(1). FCC review of rates for cable programming service is triggered on a case-by-case basis when a subscriber, franchising authority, or other relevant State or local

governmental entity files a complaint. 47 U.S.C. §§ 543(c)(1)(B), (c)(3).

In implementing the Act, the FCC promulgated rules for determining the highest rate that each regulated cable system could charge initially, as well as rules for calculating allowable rates on a "going-forward" basis. The Commission further decided to apply both sets of rules in a "tier-neutral" fashion, meaning that the same methodology is used to set rates for the basic service tier and for cable programming service. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Report and Order and Further Notice of Proposed Rulemaking*, 8 F.C.C.R. 5631, 5759–60, 5881–82 (1993) (hereinafter *"Rate Order "*); *see also Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, First Order on Reconsideration, Second Report and Order, and Third Notice of Proposed Rulemaking*, 9 F.C.C.R. 1164, 1182–85 (1993) (hereinafter *"First Reconsideration "*). The tier-neutral approach is designed to ensure that a cable system has no incentive to move programming between the basic service and cable programming service tiers: the incremental charge it can make for a particular channel will be the same regardless whether the channel is placed in the basic service tier or in a cable programming service tier. *See First Reconsideration,* 9 F.C.C.R. at 1183.

## II. ANALYSIS

The cable petitioners challenge the FCC regulation with respect to: (1) the methods the Commission used to arrive at the initial rates that a cable system may charge; (2) the rules it prescribed concerning the amount a system may charge for equipment; (3) its decision to regulate the basic service tier and cable programming service on a "tier-neutral" basis; and (4) its treatment of costs that the cable companies incurred during the "gap period" between passage of the Act and the date upon which each cable operator became subject to rate regulation under the Act. The cities in turn challenge various aspects of: (1) the rules for setting

initial rates; and (2) the "going-forward" rules.

■ Insofar as the various challenges involve the FCC's interpretation of the 1992 Cable Act, we apply the rule of *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984): If the statute is clear, then that is the end of the matter, for we "must give effect to the unambiguously expressed intent of Congress." If, however, the statute is silent or ambiguous with regard to a specific issue, then we must accept the interpretation of the agency so long as it is reasonable. *Id.* at 843, 104 S.Ct. at 2781. As discussed in the opinion for the court addressing the First Amendment aspects of this case, no "grave constitutional question" is implicated by the FCC's interpretation of the statute, and hence we need not consider whether *Chevron* deference would apply if such a question were to arise.

■ Insofar as the various challenges amount to a claim that the Commission behaved arbitrarily and capriciously, we review the record with an eye to whether the agency has "examine[d] the relevant data and articulate[d] a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturer's Ass'n of the United States v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). How taut is our "surveillance of the rationality of agency decisionmaking, however, depends upon the nature of the task assigned to the agency." *National Cable Television Ass'n v. Copyright Royalty Tribunal,* 724 F.2d 176, 181 (D.C.Cir.1983). Because agency ratemaking is far from an exact science and involves "policy determinations in which the agency is acknowledged to have expertise," our review thereof is particularly deferential. *United States v. FCC,* 707 F.2d 610, 618 (D.C.Cir. 1983); *see also Northern States Power Co. v. FERC,* 30 F.3d 177, 180 (D.C.Cir.1994).

We shall first address both groups of petitioners' challenges to the rules for setting initial rates, then take up both groups' objections to the going-forward rules. We shall turn last to the other issues raised by the cable petitioners.

A. *The Rules For Setting Initial Rates*

After considering a number of alternative ways of determining whether basic service tier rates are reasonable, the Commission decided to rely primarily upon the yardstick provided by systems that face effective competition. *Rate Order,* 8 F.C.C.R. at 5761–67. To this end, the Commission gathered rate (and other) information from 141 cable systems that satisfy the statutory standard for effective competition, as well as from a random sample of approximately 300 cable systems that do not. *Rate Order,* 8 F.C.C.R. at 5761. Using multiple regression analysis, the FCC originally isolated three factors other than competition that affect a system's rates: the number of channels it offers, the number of subscribers it has, and the number of signals it receives by satellite. *Id.* at 5768–69, 6143–44. Controlling for those factors, the Commission compared the rates charged by the non-competitive and the competitive systems and found that there was a 10 percent "competitive differential," meaning that on average, non-competitive systems charged about 10 percent more than similar systems that faced effective competition. *Id.* at 5766, 6145. Using the same data, the Commission also developed a benchmark formula for calculating the per channel rate that a cable system subject to effective competition would charge, taking into account the number of channels, of subscribers, and of satellite-delivered signals provided by that system. *Id.* at 5770–71.

Originally the FCC decided that systems not facing effective competition would be required to use the benchmark formula to set their initial rates, except that no system would be required to reduce its existing rates by more than 10 percent. *Id.* at 5771–72. Any system that was at or below its benchmark rate would not have to reduce its rates at all, *id.,* and any system could opt out of the regime entirely by requesting that its rates be set by means of conventional cost-of-service regulation. *Id.* at 5797–5800. Although the Commission, upon reconsideration, first refused to alter these rules, *First Reconsideration,* 9 F.C.C.R. at 1173–77, it later agreed to make substantial changes. *See Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Second Order on Reconsideration, Fourth Report and Order, and Fifth Notice of Proposed Rulemaking,* 9 F.C.C.R. 4119 (1994) (hereinafter *"Second Reconsideration"*).

The Commission re-analyzed the data concerning the aggregate difference between the rates charged by systems that do and systems that do not face effective competition, and determined that the competitive differential was actually 17 percent rather than 10 percent. *Id.* Most of the increase traces to two refinements in the Commission's methodology. First, in a further multiple regression analysis, the FCC isolated and controlled for certain additional factors that affect a system's rates. *Id.* at 4155–59. More significant, however, is the change in the way the Commission weighted the rate data. In the *Rate Order,* 8 F.C.C.R. at 5644, the Commission had arrived at the 10 percent competitive differential by aggregating the data for systems facing effective competition (as defined) and comparing the result to the rate data for systems that do not face effective competition. Because 79 of the systems in the group facing effective competition group were low penetration systems (compared to 46 overbuilds and 16 municipals), this approach gave the greatest weight to the data for low penetration systems and the least weight to the data for municipal systems. In the *Second Reconsideration,* 9 F.C.C.R. at 4153–55, the Commission disaggregated the data for the three types of systems facing effective competition and calculated a competitive differential for each group. This approach yielded competitive differentials of approximately one percent for low penetration systems, 13 percent for overbuilds, and 37 percent for municipal systems. *Id.* at 4160, 4296.

For various reasons discussed below, the FCC decided that the overbuild sample provides the best indicator of the effects of competition upon rates. *Id.* at 4160–66. The FCC adjusted the overbuild figure from 13 percent to 16 percent, however, by factoring in the percentage of each system in that group that is actually overbuilt by a competing system. *Id.* at 4162. The Commission

then used the competitive differentials for low penetration and municipal systems only as factors in deciding to raise the overall differential further to 17 percent, *id.* at 4165–66, of which also more below.

Having established the new 17 percent competitive differential, the FCC further decided that all systems not facing effective competition must reduce their initial rates by 17 percent. *Id.* at 4166–68. The Commission did, however, provide some important qualifications. First, as in the old regime, a cable system can avoid the automatic (now 17 percent) reduction by opting for cost-of-service regulation. *Id.* at 4168. Second, if a 17 percent reduction would put a particular cable system's rates below the rate allowable under the benchmark formula, then the system is required to reduce its rates only to the benchmark level until such time as the Commission has confirmed the accuracy of the 17 percent competitive differential by gathering and analyzing industry cost data. *Id.* at 4168–69. Similarly, "small operators," defined by the Commission as those that have 15,000 or fewer subscribers and that are not affiliated with a larger operator, are not required to implement initial rate reductions at all until the Commission completes its analysis of industry cost data. *Id.*

### 1. *The Cable Companies' Petitions*

The cable petitioners advance a wide array of arguments challenging the methods by which the Commission arrived at the 17 percent competitive differential; they also challenge its decision to require all regulated systems (with the exceptions mentioned above) to institute the 17 percent rate reduction. Their arguments, though impressive in scope, are ultimately unconvincing.

### a. *Low Penetration Data*

■ The cable petitioners first contend that the Commission violated the Act by failing to assign "proportionate weight" to the data for low penetration systems in establishing the competitive differential that forms the basis for the initial rate reductions the agency required. Recall that the Act provides that "regulations [to ensure the reasonableness of basic rates] shall be designed

to achieve the goal of protecting subscribers ... from rates ... that exceed the rates that would be charged for the basic service tier if [the] cable system were subject to effective competition." 47 U.S.C. § 543(b)(1). The Act further states that "in prescribing such regulations, the Commission ... shall take into account" seven listed factors, one of which is "the rates for cable systems, if any, that are subject to effective competition...." 47 U.S.C. § 543(b)(2). These provisions may well require the Commission, in establishing "reasonable" initial rates, to consider information about systems facing effective competition, which is, of course, precisely what the FCC has done. They do not, however, even suggest how the Commission should weigh the rate data from each subcategory of systems facing effective competition. Indeed, the text of the Act and its legislative history do not even provide the Commission with any guidance about how to weigh the seven factors that it is supposed to take into account, let alone how to weigh subcategories of data relevant to one particular factor.

The only other direction that the Act gives the FCC for the establishment of rates for the basic tier is that it must "seek to reduce the administrative burdens on subscribers, cable operators, franchising authorities, and the Commission," to which end it "may adopt formulas or other mechanisms and procedures." 47 U.S.C. § 543(b)(2)(A), (B). The Congress thus refrained from micromanaging the Commission in the way that the cable petitioners now ask the court to do. In the absence of any statutory requirement that could be read to require the Commission to give "proportionate weight" to the rates charged by low penetration systems, however, we are not at liberty to oblige the petitioners.

Perhaps anticipating the futility of the "proportionate weight" argument, the cable companies argue in the alternative that the Act requires the Commission to assign at least some weight to the low penetration data, and that the Commission failed to do so. This claim is factually incorrect. Although the 37 percent competitive differential for municipal systems caused the Commission to believe that the 16 percent differ-

ential for overbuilds was too low, the Commission "discounted [the municipal system data] somewhat ... on account of [its] consideration of low penetration systems, which had only a one percent competitive differential." *Second Reconsideration,* 9 F.C.C.R. at 4166, 4195. Thus we see that the Commission did give some weight to the data for low penetration systems.

■ The cable petitioners further contend that even if the Commission's treatment of the low penetration data did not violate the Act, it was nonetheless arbitrary and capricious for the agency not to have given the data greater weight. The Commission, however, articulated a powerful economic rationale for according only minimal weight to those data.

Under the statute, a cable system falls into the low penetration category if it serves less than 30 percent of the homes in its franchise area, regardless of its penetration rate for the subset of homes that it actually passes. 47 U.S.C. § 543(*l*)(1)(A). The Commission noted that both its own data and an industry study suggest that a substantial number of the systems in the low penetration group serve more than 30 percent of the homes they pass. *Second Reconsideration,* 9 F.C.C.R. at 4162. The Commission reasonably concluded, therefore, that low penetration may reflect only the geographic limitations of the system rather than the presence of substitutes that restrain the cable operator from exercising market power; thus the low penetration group may well include systems that, due to market power, are able to charge rates substantially above the competitive equilibrium point.

The FCC could not verify this possibility without collecting and analyzing extensive data concerning the low penetration group's costs, but this was not realistically possible within the 180–day statutory deadline for the FCC to promulgate regulations. 47 U.S.C. § 543(b)(2); *see National Ass'n of Regulatory Utility Comm'rs v. FCC,* 737 F.2d 1095, 1124, 1138–42 (D.C.Cir.1984) (accepting agency ratemaking decision based upon agency's expertise and best available information despite agency's failure to amass additional useful data). Bearing in mind that one of the

Congress's declared purposes in enacting the Cable Act was to eliminate the effects of undue market power, *see* § 2(b)(5), we conclude that the FCC's decision to give the data for low penetration systems only limited weight was reasonable.

b. *Overbuild Data*

The cable petitioners next challenge the FCC's decisions to: (1) give the greatest weight to the overbuild data; (2) adjust the overbuild differential from 13 percent to 16 percent; and (3) adjust the final competitive differential further from 16 percent to 17 percent.

■ The cable petitioners' statutory challenge to the Commission's decision to give the greatest weight to the overbuild data is based upon the same premise as its statutory challenge to the agency's decision to give little weight to the low penetration data, and therefore fails for the reasons discussed in the previous section. Therefore it remains for us to decide only whether the Commission's action was arbitrary and capricious.

The FCC reasoned that because overbuilds face actual head-to-head competition, they provide the most accurate data for the purpose of simulating competitive cable rates, *Second Reconsideration,* 9 F.C.C.R. at 4612, a proposition that seems at first glance to be nearly self-evident. The cable petitioners point out, however, that the competitive differential for overbuilt systems falls over time. That trend, they argue, suggests that newly overbuilt cable systems engage in "price wars": Either the incumbent system charges below-cost rates designed to drive the entering competitor out of the market or the new entrant charges below-cost rates in order to "greenmail" the incumbent into offering to buy it out upon favorable terms. Accordingly, the companies suggest that the overbuild sample reflects artificially low rates and, correspondingly, an artificially large differential from non-competitive systems.

■ In the *Second Reconsideration,* 9 F.C.C.R. at 4163–64, the Commission offered its own hypothesis that the diminution in the competitive differential over time could be due to the emergence of "parallel or coordi-

nated pricing." *Id.* at 4163–64. According to that theory, competing cable companies learn over time how to collude in, or tacitly to coordinate, their pricing and therefore exercise greater market power than would be possible if they were truly competing. As the Commission suggested, this theory gains support from the fact that there are typically only two systems in any overbuilt area, which makes collusion or tacit coordination more plausible than it otherwise would be. Moreover, because information about rates is readily available and cable companies do not enter into long-term contracts with their subscribers, each duopolist would be able to detect and to retaliate against the other's slightest departure from the rate upon which the two had expressly or impliedly agreed. *Id.; see also William J. Baumol & Alan S. Binder, Economics: Principles and Policy* 599 (5th ed. 1991) (ability to offer secret discounts undermines ability of oligopoly to cartelize). The FCC's explanation therefore suggests that in light of the structure of the local cable market, it may be only in the early stages of direct head-to-head competition that overbuilt systems actually charge competitive rates. Although the Commission's explanation cannot be proven without additional data, and although "[a] theory of ratemaking must be reasonable, explained, and supported," it "is not subject to the same substantiation principle as the substantial evidence test applicable to factfinding." *National Ass'n of Greeting Card Publishers v. United States,* 607 F.2d 392, 401 (D.C.Cir. 1979) (quoting *Continental Airlines Inc. v. CAB,* 551 F.2d 1293, 1301 (D.C.Cir.1977)). The Commission's theory is not so implausible that reliance upon it is unreasonable, especially when one considers that there is no evidence in the record, either anecdotal or analytical, to provide empirical support for the cable companies' price war hypothesis. Therefore we reject the cable petitioners' claim that the Commission's decision to rely primarily upon the overbuild data is arbitrary and capricious.

■ As mentioned above, the FCC adjusted the overbuild figure from 13 to 16 percent by factoring in the percentage overlap between each pair of overbuilt systems in that group. *Second Reconsideration,* 9 F.C.C.R.

at 4162, 4284–85. The Commission hypothesized that not all overbuilds are equal because the intensity of the competition that an overbuilt system faces is likely to vary with the extent to which it actually overlaps with a competing system. *Id.* at 4284. That assumption seems completely reasonable, and the cable petitioners do not take issue with it as a theoretical matter. They argue, however, that the Commission unreasonably assumed that the intensity of competition is directly proportional to the percentage of overlap, and, where it lacked adequate data, unreasonably assumed that the percentage of overlap was the least possible given the percentage of the total franchise area covered by the respective systems.

With regard to the first objection, we simply note that the Commission's assumption of a linear relationship between the two variables certainly was reasonable, if only because it would have been virtually impossible to derive a more precise understanding of the relationship between the extent of overlap and the intensity of competition in the time available. *See NARUC,* 737 F.2d at 1124 (The "scope of agency expertise is often pragmatically circumscribed . . . by the need to respond to . . . regulatory problems . . . within a reasonable period of time").

As for the second objection, while it would have been possible to determine the actual amount of overlap between each pair of competing systems for which it did not already have that datum, the Commission's decision not to do so was a logical one; a new competitor, before attempting to compete head-to-head with the incumbent, typically will lay cable in areas of the franchise to which the existing cable system does not already provide service. Especially in light of the time constraint the Commission faced and the difficulty of gathering additional information, we see nothing unreasonable in its making that simplifying assumption.

■ The cable companies' challenge to the FCC's adjusting the overbuild differential of 16 percent to the final competitive differential of 17 percent fares no better. They argue that this adjustment is improperly based upon the Commission's assumption

that parallel or coordinated pricing between overbuilt systems resulted in an artificially small overbuild differential. We have already held that the Commission's reliance upon the parallel or coordinated pricing theory is not arbitrary and capricious. Moreover, the Commission did not rely solely upon that theory in reaching its decision to adopt the 17 percent figure; in the *Second Reconsideration*, 9 F.C.C.R. at 4166, the Commission made it clear that it also relied upon the data for municipal systems (which indicated a much larger differential) and the availability of the cost-of-service ratemaking alternative for any system the rates of which would otherwise be unduly reduced. Cumulatively, those factors adequately support the Commission's decision to adjust the competitive differential upwards by the additional one percent.

### c. Large System Data

■ The cable petitioners note that when the rate data gathered by the Commission are divided between large and small systems, the line of demarcation being set at 5,000 subscribers, the competitive differential for large systems is statistically insignificant. Based upon that observation, they conclude that large systems that do not face effective competition (as defined in the Act) do not exercise market power (*i.e.,* do not charge supracompetitive rates), and thus the Commission's decision to apply the 17 percent reduction of initial rates to large systems was arbitrary and capricious. When the cable petitioners made the same argument to the Commission they did not offer any explanation of why large systems that do not face effective competition either cannot or for some reason do not exercise market power to raise their rates. In their brief before this court, however, the cable companies suggest that large systems are generally located in areas that have more entertainment alternatives (*e.g.,* broadcast television channels, video stores, cinemas, and live entertainment, including sporting events) and that these substitutes deprive the cable companies of market power.

The FCC responds to the cable companies' theory by noting that it has already analyzed one of those substitutes—additional broadcast television channels—and found no evidence that it limits the market power of cable companies. Although it is, of course, possible that the other proffered substitutes do limit cable's market power, the finding concerning broadcast television—which intuitively seems to be the closest substitute for cable television—takes much of the wind out of the cable petitioners' sails.

More important, however, the FCC's response when originally faced with the issue in the course of rulemaking demonstrates that its decision not to treat large systems differently was not arbitrary and capricious. Concerned that the cable companies' approach was "statistically risky" because it involved subdividing the already small sample of systems facing effective competition into still-smaller sub-samples, *Second Reconsideration*, 9 F.C.C.R. at 4160, the Commission analyzed the data for systems of all sizes in an effort to discern the relationship (if any) between system size and rates. *Id.* at 4159–4160, 4301–03. The results lent no support to the cable companies' contention that large systems without the constraint imposed by "effective competition" charge rates nearer to the competitive level than do small systems. *Id.* Moreover, the separate statistical analysis that the FCC did to take account of the percentage overlap between overbuilt systems—which, as we have seen, the Commission reasonably believes gives a more accurate measure of the competitiveness of a cable market—showed that the effect of system size on the competitive differential is not significant. *Id.* at 4159–60. In light of both the Commission's statistical analyses and the failure of the cable petitioners to provide any support (beyond the comparison of systems on either side of the 5,000 subscriber mark) for their new theory, we cannot conclude that the FCC was unjustified in applying the 17 percent competitive differential to both large and small systems.

### d. Application of the 17 Percent Initial Rate Reduction to All Systems Not Facing Effective Competition

■ The cable petitioners (including Blade Communications) attack the 17 percent

initial rate reduction as, in effect, too blunt an instrument. Specifically, they argue that it is arbitrary and capricious because it falls equally upon all regulated systems, without regard to whether and by how much a particular system's past rates exceeded the amount it would have charged had it been subject to effective competition.

To impose an across-the-board 17 percent rate reduction upon all regulated systems might indeed force an historically low-priced system to lower its rates below the competitive level, but that is not what the Commission has done here. Faced with the statutory command to avoid placing an undue administrative burden upon franchising authorities, cable operators, subscribers, and itself, 47 U.S.C. § 543(b)(2)(A), and armed with express statutory permission to adopt formulas in order to meet this requirement, 47 U.S.C. § 543(b)(2)(B), the Commission established not only the general 17 percent rule but also a number of important exceptions thereto. Specifically because it recognized the possibility that some low-priced systems may not have exercised significant market power to raise past rates, the Commission accorded those systems (as well as unaffiliated systems with 15,000 or fewer subscribers) "transition relief" from the 17 percent rule. *Second Reconsideration,* 9 F.C.C.R. at 4167–69, 4172–82. Low-priced systems—defined by the Commission as systems the rates of which would be below their revised benchmark rates if the full 17 percent reduction were imposed—are required to reduce their rates only to their revised benchmark level until the Commission completes an analysis (still on-going) of whether such systems face "unusual demand, cost or other influences" that would render the 17 percent reduction excessive. *Id.* at 4168–69, 4176–79. Presumably any system that kept rates near the competitive level, notwithstanding the absence of "effective competition," did so not out of charity but because it faced an "unusual [elasticity of] demand," meaning that con-

sumers in its area were more inclined than consumers in the average market to forego subscribing to cable if rates were higher. We fully expect the Commission's current study to address the plight in which Blade claims to find itself.

Recognizing that the 17 percent reduction could be excessive for still other systems—those facing high costs rather than high elasticity of demand—the Commission also adopted the cost-of-service "safety valve," whereby any system for which the 17 percent reduction would result in unreasonably low rates can instead opt to have its rates set on the basis of its individual costs. *Second Reconsideration,* 9 F.C.C.R. at 4195–97; *Rate Order,* 8 F.C.C.R. at 5797–5800. By thus establishing an easily applied general rule along with well-targeted exceptions, the FCC effectively balanced its twin responsibilities of ensuring reasonable rates and reducing administrative burdens.

In sum, Blade's concern with the plight of low-priced systems, though not fanciful, has been adequately addressed by the Commission. So too has the Commission addressed, via the cost-of-service safety-valve, the concerns of systems that face unusually high input costs.[1]

### 2. *The Cities' Petition*

The cities attack the Commission's initial-rate rules from a different perspective, arguing that the rates allowed by the Commission are too high to accomplish the purposes of the Act. They challenge both the 17 percent figure itself and several decisions that the Commission made in applying it.

■ Their direct challenge to the 17 percent figure need not detain us long in light of our extensive discussion of that figure above and the cursory nature of the cities' argument. Citing studies that apparently suggest that cable rates exceed competitive lev-

---

1. The cable petitioners also contend that the transition relief is incomplete insofar as a system entitled to such relief is not allowed to take increases for inflation under the going-forward rules until the effect of inflation has been to reduce its (frozen) rate by 17 percent in real terms. The FCC has since mooted this concern, however, by reversing itself *sua sponte* and allowing those systems to take increases for inflation. *See Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Ninth Order on Reconsideration, —— F.C.C.R. —— (1995).

els by more than 17 percent, the cities contend in a single sentence in their main brief that "[t]he FCC had ample evidence before it suggesting that, if anything, the differential [the FCC] identified was still far too low." The slightly different question before us, however, is whether the Commission had adequate evidence for the conclusions it reached. It relied upon its own analysis of the cable industry rather than the studies of others, but that in itself hardly renders its decision improper. The Commission gathered extensive industry rate data both from systems that do and from systems that do not face effective competition and did a variety of regression analyses designed to control for variables other than competition that could affect rates. The agency brought its expertise and experience to bear in deciding how to weigh the various data sets (*i.e.*, overbuild, low penetration, and municipal systems), ultimately arriving as we have seen at the 17 percent differential. The cities' conclusory assertion gives us no reason to believe that the FCC's approach was any less reliable than the outside studies to which the cities point without elaborating upon the methodologies, assumptions, or data used in them. In sum, the Commission has supported its 17 percent rule with substantial evidence and has articulated a rational connection between the facts that it found upon the basis of that evidence and its ultimate decision to adopt the 17 percent initial rate reduction; meanwhile the cities have failed to provide convincing evidence that the Commission erred.

■ The cities next offer two challenges to the particular way in which the FCC implemented the 17 percent rule. First, they argue that the cost-of-service alternative that the Commission made available improperly favors cable operators: an operator may opt for cost-of-service regulation if it believes that its rates would otherwise be too low, but the local franchising authority may not subject the operator to that method of ratesetting if it believes that cable rates would otherwise be too high. This argument proceeds from a misunderstanding of the statutory mandate and the asymmetrical constitutional imperative that the FCC faces.

The Commission concluded that the cost-of-service option should be made available to cable operators as a limited "safety-valve" for unusual cases in which the operator "would be harmed by applying the [17 percent rate reduction]." *Second Reconsideration*, 9 F.C.C.R. at 4166; *accord Rate Order*, 8 F.C.C.R. at 5755–56. That conclusion seems wise in light of the distinct possibility that an unexceptioned rate reduction could unconstitutionally yield confiscatory rates for cable systems that have not exercised market power significantly to raise rates in the past. *See Southern Bell Tel. & Tel. Co. v. FCC*, 781 F.2d 209, 214 (D.C.Cir.1986) ("rates obviously do not fall within a zone of reasonableness if they are so low as to be constitutionally confiscatory"). Moreover, because a cost-of-service regulatory proceeding is expensive for the cable operator, *see Rate Order*, 8 F.C.C.R. at 5755, the FCC can be confident that an operator will not lightly choose that option and it will indeed remain a limited exception to the general rule.

■ By imposing a broad 17 percent reduction while allowing a limited cost-of-service safety-valve, the Commission effectively balanced the statutory goal of reducing administrative burdens and the constitutional necessity of avoiding confiscatory rates. This careful balance likely would be upset if local franchising authorities were allowed to impose cost-of-service regulation. In view of the comments filed by the cities during the proceedings under review, *see Rate Order*, 8 F.C.C.R. at 5754, it appears that a significant number of municipalities would impose cost-of-service ratemaking upon cable operators if authorized to do so, and that the statutory goal of administrative efficiency would be severely compromised thereby. Nor could such a loss of administrative efficiency be justified, as it would be in the current scheme, as necessary to prevent an unconstitutional outcome. Although we stop short of concluding that allowing franchising authorities to impose cost-of-service regulation would violate the Act (a question we need not decide here), we do conclude that the FCC's decision not to give them that authority was reasonable in light of the Commission's statu-

tory mandate to reduce administrative burdens.[2]

▇▇ The cities' other challenge to the Commission's implementation of the 17 percent rule goes to the transition relief it afforded small and low-priced systems, which they say frustrates the purpose of the Act. The cities argue that because the Commission's transition relief rules allow a large percentage of all cable companies to avoid reducing their rates by the full 17 percent, the FCC has failed to meet its statutory mandate to ensure reasonable rates. As discussed above with regard to the cable petitioners' challenges, the FCC promulgated the general 17 percent rule and the exceptions for transition as a package that was reasonably designed to meet the Act's competing goals of administrative efficiency and reasonable rates. To that discussion, we add here only the observation that the transition relief is in fact transitory; the FCC proposes ultimately to apply the 17 percent rule to small and low-priced systems unless its further study produces evidence to support a different rate. *Second Reconsideration*, 9 F.C.C.R. at 4173, 4176–77. Although the cities raise the possibility that completion of that study may yet be far off, we need not address that concern now; no one argues that the time thus far elapsed is at all excessive in light of the complexity of the Commission's task.

B. *The Rules for Setting "Going–Forward" Rates*

Having established the methods for setting the rate that a regulated cable system may charge initially (the 17 percent rate-reduction and the cost-of-service alternative), the Commission adopted a price cap regime (the so-called "going-forward" rules) for regulating future rates. *See generally, Second Reconsideration*, 9 F.C.C.R. at 4200–07; *Rate Order*, 8 F.C.C.R. at 5774–95. Under that regime, a cable system may adjust its initial per channel rate annually in order to reflect

inflation and quarterly in order to reflect changes in certain of its costs that the Commission considers to be effectively beyond the cable operator's control. *Second Reconsideration*, 9 F.C.C.R. at 4200–04; *Rate Order*, 8 F.C.C.R. at 5782–83. These so-called "external costs" are: (1) the retransmission consent fees cable operators pay to broadcasters; (2) programming costs; (3) taxes; and (4) franchise fees and the costs associated with other franchise requirements, including the provision of public, educational, and governmental-access programming. *Second Reconsideration*, 9 F.C.C.R. at 4201–02; *Rate Order*, 8 F.C.C.R. at 5783–90.

The Commission decided to use a price cap regime because it would be less costly to administer than traditional cost-of-service regulation and would have the added advantage of providing operators with an incentive to be efficient—the lack of which is a notorious drawback of cost-of-service regulation—while still ensuring that rates remain reasonable. *Rate Order*, 8 F.C.C.R. at 5776–77; *cf. National Rural Telecom Ass'n v. FCC*, 988 F.2d 174, 177–78 (D.C.Cir.1993) (describing incentive to be efficient under price cap regulation).

The cities advance an array of arguments that these rules are arbitrary and capricious and inconsistent with the 1992 Cable Act. The cable petitioners challenge only one specific provision as arbitrary and capricious.

1. *The Cities' Petition*

*First.* At the outset, the cities suggest that because the price cap formula is keyed to the rates that regulated systems are allowed to charge initially, it will only amplify the unreasonableness of those rates. Of course, that general contention depends upon the success of the cities' attack upon the validity of the 17 percent rule for initial rates which, as we have already seen, failed. We turn therefore to the cities' more specific points.

---

**2.** The cities also criticize the FCC's decision to allow cable companies, after one year of regulation, to opt for cost-of-service regulation on a tier-specific basis. The cities, however, have not filed a petition for review of the order in which the Commission adopted this rule (*viz., Imple-*

*mentation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Third Report and Order*, 8 F.C.C.R. 8444 (1993)). Therefore, the cities' challenge on this issue is not properly before the court.

172

*Second.* The cities claim that the FCC should not have treated franchise-related costs (including fees paid to franchising authorities) and programming costs as external because cable companies in fact have significant control over those costs. Although cable operators may indeed have some bargaining power vis-a-vis franchising authorities and programmers, there is no evidence in the record to support the cities' contention that operators have substantial control over franchise-related and programming costs, *i.e.*, that franchising authorities and programmers are price takers. Moreover, the Commission's decision to grant external treatment to such costs was in part meant to give effect to the specific provisions of the Act that require the Commission to take into account, in prescribing rate regulations for the basic service tier, both franchise fees and other costs associated with meeting franchise requirements. 47 U.S.C. §§ 543(b)(2)(C)(v), (vi); *First Reconsideration,* 9 F.C.C.R. at 1211, 1217–20. The Act is also intended to promote the expansion and diversification of cable programming, *see* §§ 2(a)(6), 2(b)(1), 2(b)(3), which is more likely to come about if cable operators may recoup their costs from subscribers willing to pay for more expensive and therefore presumably better programs. Although the statute may not require the Commission to grant external treatment to franchise-related and programming costs, the cited provisions surely give the Commission the authority to do so, particularly in the absence of evidence indicating that cable operators do in fact have substantial control over such costs.

*Third.* Although their claim is rather vague, the cities seem to suggest that the FCC improperly allowed cable operators to double count certain of their costs by according external cost treatment to some expenses that they could also take into account in establishing their initial rates. This suggestion, however, reflects a misinterpretation of the form that the Commission created for reporting external costs. Because the Commission resolved any ambiguity that the form may have created by expressly stating that only changes in costs will be recognized and accorded external treatment, *Second Recon-*

*sideration,* 9 F.C.C.R. at 4201–02, the cities' concern is unwarranted.

*Fourth.* The cities next challenge as one-sided the Commission's decision to allow cable companies to adjust rates for external cost increases quarterly while requiring them to adjust rates for external cost decreases only once a year. Although the Commission recognized that allowing quarterly increases would add to the administrative burdens it faces, it decided to provide this opportunity lest cable operators be unduly burdened by having to absorb cost increases for up to a year. *First Reconsideration,* 9 F.C.C.R. at 1233–35. That concern seems well-founded, particularly in light of (1) the constitutional concern that arises if a cable company is required to absorb costs to the point that its allowed rates become confiscatory, *see Southern Bell Tel. & Tel. Co.,* 781 F.2d at 214 & n. 5, and (2) the administrative costs of the alternative, *i.e.,* cost-of-service regulation. Because subscribers have no parallel constitutional right that would be protected by requiring quarterly adjustments to reflect cost decreases, the Commission was within its statutory mandate in deciding that such a requirement would not be worth the resulting administrative burden upon the operators and the agency itself. *See* 47 U.S.C. § 543(b)(2)(A) (requiring the Commission to "reduce administrative burdens"). Moreover, the Commission limited the ability of a cable operator to exploit the disparity in the cost increase and decrease reporting periods by requiring that any operator that files for a cost increase must set off any cost decreases against cost increases in the same quarterly report. *Second Reconsideration,* 9 F.C.C.R. at 4202.

*Fifth.* In a similar vein, the cities argue that the FCC improperly failed to require cable companies to report increases in advertising revenues and to offset those increases against any external costs. Because advertising revenues, we are told, fluctuate greatly, it would be administratively burdensome to incorporate their ups and downs into the rate-making process. Hence, the Commission's decision not to do so appears to be reasonable. We do not rule out the possibility, however, that this decision

could become unreasonable over time if evidence comes before the Commission clearly demonstrating that advertising revenues have become a steady and significant source of increased revenue for cable operators, thereby calling in question the reasonableness of the rates they may charge under the price cap formula.

█ *Sixth.* The cities finally contend that the Commission arbitrarily refused to adopt a "productivity offset" (*i.e.,* a factor to account for cost-reducing productivity gains in the cable industry) against the inflationary increases allowed to cable operators. They point to the Commission's decision to include such an offset in its telephone price cap regime, *see generally, Policy and Rules Concerning Rates for Dominant Carriers: Report and Order and Second Further Notice of Proposed Rulemaking,* 4 F.C.C.R. 2873 (1989), and argue that by failing to do so here, the Commission improperly subordinated the interests of consumers to those of cable operators.

The Commission adequately explained the apparent disparity: the record in the telephone price cap proceeding included extensive evidence demonstrating that increases in productivity in the telephone industry significantly exceed those in the general economy. *Rate Order,* 8 F.C.C.R. at 5781–82. There is no comparable evidence concerning the cable industry in the present record. Therefore, we are constrained to affirm the Commission's decision not to impose a productivity offset at this time. As with its decision not to offset advertising revenues, however, the Commission's decision not to establish a general productivity offset could ultimately prove to be unreasonable if the Commission is ever confronted with evidence indicating that the cable industry does in fact benefit from productivity increases that significantly outstrip those in the general economy.

### 2. *The Cable Companies' Petitions*

█ The cable petitioners question only whether the external-cost rules for going-forward rates should have been applied to the "gap period" between passage of the Act and the date upon which each cable operator actually became subject to rate regulation under the Act. Although the most obvious way to set cable operators' initial rates might have been simply to reduce by 17 percent the rates that they were charging when the new regulations took effect, the Commission decided not do that lest it build into the permitted initial rates any unwarranted rate increases that cable operators took after passage of the 1992 Cable Act. *Second Reconsideration,* 9 F.C.C.R. at 4170. The Commission instead decided to discount the rates charged by operators on September 30, 1992 (the last month before passage of the Act) by 17 percent, and then to adjust that rate to allow for inflation during the gap period. *Id.* at 4170–71. At the same time, however, the Commission decided not to allow cable operators to adjust their rates to reflect external cost increases incurred during the gap period, which the cable petitioners say is arbitrary and capricious.

The FCC acknowledged that allowing adjustments for changes in external costs during the gap period would make the initial rates more accurate, but it decided that doing so would place undue administrative burdens upon both cable operators and the Commission. *First Reconsideration,* 9 F.C.C.R. at 1233. That explanation is patently unconvincing for two reasons. First, the Commission's concern with the administrative burden upon cable operators is unnecessary: if the cost of recovering its increased external costs exceeds the revenue to be gained, the cable operator can be counted upon to forego the pleasure. Second, the Commission's concern with the administrative burdens that it would face also rings hollow because the type of documentation to be reviewed would be the same as the external-cost documentation that the Commission must review for all post-gap periods pursuant to the going-forward rules.

The Commission also attempts to justify its decision by noting that the disadvantaged cable operator can always turn to the cost-of-service option. But that option, by the Commission's own admission, is costly for cable operators and the Commission alike, and is intended to be a limited "safety-valve" exception. *Second Reconsideration,* 9 F.C.C.R. at 4196.

In sum, the Commission offers no reason to doubt that cable operators incurred external costs during the gap period, yet under its regulations they would never be able to recoup those costs short of opting for cost-of-service regulation—which would be akin to shooting a fly with a blunderbuss. Because the Commission's proffered justifications are completely unacceptable, we hold that its decision to preclude a rate adjustment designed to recover changes in external costs incurred during the gap period is arbitrary and capricious.

## C. *The Cable Companies' Other Challenges*

The cable petitioners make two other claims, both of which question the FCC's interpretation of certain provisions of the Act. Neither challenge can surmount the hurdle set for it by *Chevron.*

### 1. *Tier Neutrality*

As discussed in Part I, the Commission decided to apply its ratemaking rules in a "tier-neutral" fashion, meaning that the same methodologies and standards are used to establish allowable rates for both the basic service tier and the cable programming service tier(s). *First Reconsideration,* 9 F.C.C.R. at 1182–85; *Rate Order,* 8 F.C.C.R. at 5759–60, 5881–82. It did so in order to avoid creating any incentive for cable operators to move programming between the basic service and cable programming service tiers by making any such move revenue neutral. *See First Reconsideration,* 9 F.C.C.R. at 1183; *Rate Order,* 8 F.C.C.R. at 5759–5760. The FCC further explained that because it is simpler, the tier-neutral approach also serves to reduce the administrative burden upon all concerned. *Id.*

██ The cable petitioners contend that the language, structure, and legislative history of the 1992 Cable Act simply do not permit the Commission to apply the same regulatory standard to the basic service tier and to cable programming service. That contention, however, is premised upon a significant misunderstanding of the Act.

First, the cable petitioners misconstrue the Congress's findings. Focusing solely upon § 2(a)(1) of the Act, they suggest that the Congress found that only basic cable rates were excessive. Although that section begins with a reference to then-recent increases in the rates for basic cable service, it ends with the broader conclusion that "[t]he average monthly cable rate has increased almost 3 times as much as the Consumer Price Index since rate deregulation." While it is possible that the Congress meant, as the cable petitioners suggest, only that average monthly rates for basic cable service had increased by thrice the CPI, that is not what the provision says. Moreover, after reviewing the rest of the Congress's findings it becomes clear that, regardless of the proper construction of § 2(a)(1), the Congress was concerned with what it perceived to be the excessiveness of cable rates in general, not the rates for a particular type of service. Indeed, the Congress immediately followed the finding referenced by the cable operators with a general finding (in § 2(a)(2)) that cable operators serving most cable subscribers do not face effective competition and consequently exercise undue market power. That finding admits of no distinction between basic tier and cable programming service. Similarly, the Congress made findings about increasing concentration and vertical integration in the cable industry generally. *See* §§ 2(a)(4), (5).

The statute is even clearer when it broadly states that:

It is the policy of the Congress in this Act to . . .

(4) where cable television systems are not subject to effective competition, ensure that consumer interests are protected in receipt of cable service; and

(5) ensure that cable television operators do not have undue market power vis-a-vis video programmers and consumers.

§§ 2(b)(4), (5). Although the cable petitioners would like to limit that policy to the basic service tier, the stubborn fact remains that the Congress directed it to the cable industry in general. Put simply, the legislature's generalized approach to formulating the problem

and to enumerating the objectives of the statute simply do not support the cable petitioners' position that the Act is concerned only (or even concerned more) with rates for the basic service tier than with rates for cable programming service; if anything, the Congress's non-tier-specific findings and policy statement support the FCC's view that tier-neutral regulation is appropriate.

The cable petitioners also mistake the significance of certain substantive differences between the statutory sections that govern respectively the basic service tier and cable programming service. Although the Act requires the Commission to establish regulations to ensure "reasonable" rates for the basic service tier, 47 U.S.C. § 543(b)(1), with respect to cable programming service it authorizes the Commission to correct "unreasonable" rates. 47 U.S.C. § 543(c)(1)(A). The cable petitioners perceive a middle ground between the "reasonable" and the "unreasonable," suggesting that in light of those differing terms the Commission's regulation of cable programming service must be more lenient than its regulation of the basic service tier. That suggestion is at the least counterintuitive; if the Congress intended to invoke different levels of regulatory stringency, it seems most unlikely that they would have used those cognate terms to describe the two regimes.

Moreover, the Commission's explanation—that the terminological difference reflects a procedural rather than a substantive distinction in the two regulatory schemes—is a good deal more persuasive. *See Rate Order,* 8 F.C.C.R. at 5875. Although the Act requires local franchising authorities actively to regulate rates for the basic service tier in accordance with established FCC standards, it precludes the Commission from reviewing a system's rates for cable programming service unless and until it receives a complaint from a subscriber, the franchising authority, or some other relevant state or local governmental entity. *Compare* 47 U.S.C. § 543(b) *with* 47 U.S.C. § 543(c). Consequently, rates for the basic service tier will always be reviewed *ex ante* while rates for cable programming service will only be reviewed *ex post.* It therefore makes sense that the Congress would formulate the question respect-ing the basic service tier as whether, *ex ante,* a proposed rate would be reasonable, and yet formulate the question respecting cable programming service as whether, *ex post,* an existing rate is unreasonable. Because those key terms are strikingly similar and the slight difference between them is easily explained as a product of the different procedural postures in which they will arise, we conclude that this text actually supports the Commission's tier-neutral approach rather than the contentions of the cable companies.

The cable petitioners also point to other differences between the regulatory regimes for the basic service tier and for cable programming service. They note, for example, that the Act provides that "in establishing the criteria for determining in individual cases whether rates for cable programming services are unreasonable" the Commission shall "consider" six factors, 47 U.S.C. § 543(c)(2), several of which are different from the factors that the statute requires the Commission to take into account in prescribing regulations to govern rates for the basic service tier. They focus upon two of the six statutory factors—"rates for similarly situated cable systems offering comparable cable programming services," 47 U.S.C. § 543(c)(2)(A), and "the history of the rates for cable programming services," 47 U.S.C. § 543(c)(2)(C)—and argue that the Commission failed to account for those factors in opting for tier-neutral regulation.

■ This argument is unpersuasive for several reasons. First, the statute by its terms merely requires the Commission to consider the six factors in deciding how best to determine whether a rate is unreasonable. 47 U.S.C. § 543(c)(2). That means only that it must "reach an express and considered conclusion" about the bearing of a factor, but is not required "to give any specific weight" to it. *Central Vermont Ry., Inc. v. ICC,* 711 F.2d 331, 336 (D.C.Cir.1983). Therefore, when the Commission, after expressly considering the potential role of the rate history factor, ultimately concluded that it should not be given any weight, *see Rate Order,* 8 F.C.C.R. at 5764–65, 5766, 5882 n. 970, it did not violate the statute.

■ The cable petitioners are simply wrong in suggesting that the Commission never considered the role of "similarly situated cable systems." The Act provides:

In establishing the criteria for determining in individual cases whether rates for cable programming services are unreasonable ... the Commission shall consider, among other factors ... (A) the rates for similarly situated cable systems offering comparable cable programming services, taking into account similarities in facilities, regulatory and governmental costs, the number of subscribers, and other relevant factors. ...

47 U.S.C. § 543(c)(2). This the Commission did by gathering data for both non-competitive and competitive systems and performing multiple regression analyses in order to isolate and to control for factors that affect cable rates other than the degree of competitiveness in the market. That exercise was in effect a comparison of similarly situated cable systems undertaken in order to determine which characteristics (such as types of facilities, number of subscribers *etc.*) have an effect on rates. *See Second Reconsideration,* 9 F.C.C.R. at 4178 n. 165, 4288–4301; *Rate Order,* 8 F.C.C.R. at 5768–69, 6143–47. We therefore reject the cable petitioners' claim that the Commission did not adequately consider similarly situated systems.

Finally, the cable petitioners seize upon the requirement in the provision regulating the basic service tier that the Commission's regulations "shall be designed to achieve the goal of protecting subscribers ... from rates for the basic service tier that exceed the rates that would be charged ... if such cable system were subject to effective competition." 47 U.S.C. § 543(b)(1). Although the provision regulating cable programming service includes, as one of the six factors that the Commission must consider in establishing the criteria for determining whether rates are unreasonable, the "rates for cable systems ... subject to effective competition," 47 U.S.C. § 543(c)(2)(B), it does not contain an express directive that rates not exceed the competitive level, as does the provision for the basic service tier. All that difference could establish, however, is that the Commission has greater discretion in determining

whether a rate for cable programming service is unreasonable than it has in determining whether a rate for the basic service tier is reasonable; it does not mean, as the cable petitioners appear to suggest, that the Commission must permit rates for cable programming service that are higher than those that would occur were the system subject to effective competition. In adopting the tier-neutral approach, the Commission did not ignore the relatively minor constraints that the Act places upon it in determining what constitutes an unreasonable rate for cable programming service; quite the contrary, the Commission met those requirements and exceeded them. We therefore reject the cable petitioners' claim that the Commission cannot apply the "effective competition" lodestar to rates for both the basic service tier and cable programming service.

To recapitulate: the statutory findings and policy statement, and the text of the provisions requiring that the Commission prescribe "reasonable" rates for basic service and proscribe "unreasonable" rates for cable programming service all support the Commission's tier-neutral approach. Although there are some differences in the factors that the Commission must consider in crafting its regulations for the two different tiers, the agency did consider those factors and account for them in adopting the tier-neutral approach. We therefore conclude that the tier-neutral approach is based upon a permissible interpretation of the Act.

■ Finally the cable petitioners contend that even if the tier-neutral approach is permitted by the Act, the Commission erred by failing to give each cable operator the option instead to come under an overall rate limit by lowering its rates for the basic tier and raising its rates for cable programming service. They argue that such an "umbrella" option would harm nobody because it would still preclude cable operators from raising their rates, in the aggregate, above what would be allowed under the tier-neutral approach, and would benefit some subscribers because it would provide cable operators with the flexibility to lower their rates for the basic service tier that all subscribers are required to purchase under the Act.

Although the umbrella option might not result in higher rates, it would, as the Commission explained, significantly increase the administrative burden associated with regulating cable rates. *Rate Order*, 8 F.C.C.R. at 5759–60. Indeed, rather than having one set of rules that applies to all regulated tiers, the addition of the umbrella option would require the Commission to develop an alternative set of rules for those systems that opt to have their rates reviewed in the aggregate. Also, because local franchising authorities are primarily responsible for monitoring rates for the basic service tier while rates for cable programming service fall exclusively within the Commission's purview, 47 U.S.C. § 543(a)(2), the umbrella approach would add administrative burdens by requiring greater coordination between the two regulators. In light of the Act's requirement that the Commission seek to reduce administrative burdens, 47 U.S.C. § 543(b)(2)(A), we hold that the Commission's decision to reject the umbrella option was not unreasonable.

### 2. *Regulatory Treatment of Equipment Used By Subscribers*

■ The 1992 Cable Act provides that: The regulations prescribed by the Commission under [the basic service tier] subsection shall include standards to establish, on the basis of actual cost, the price or rate for—

(A) installation and lease of the equipment used by subscribers to receive the basic service tier, including a converter box and a remote control unit and, if requested by the subscriber, such addressable converter box or other equipment as is required to access [video programming offered on a per channel or per program basis.]

47 U.S.C. § 543(b)(3). Because this provision limits to actual costs the rate that a cable operator may charge for equipment, its scope is of considerable economic importance. The Commission has interpreted it to cover all equipment that a subscriber uses to receive the basic service tier in a system not subject to effective competition; that includes equipment that is also used to receive other cable services. *Rate Order*, 8 F.C.C.R.

at 5800. Not surprisingly, the cable companies offer a more narrow interpretation; they argue that the provision does not extend to any equipment that is used in part to receive cable programming service. Equipment used in part to receive cable programming service would, under the cable companies' view, be regulated in accordance with the general rate regime for cable programming service, meaning only that the rates for such equipment may not be "unreasonable." Although the statute is far from clear, the Commission's interpretation is a permissible one, and therefore must prevail.

The cable petitioners' interpretation is suspect for two reasons. First, it does violence to the natural meaning of the term "used": that term is not normally understood to mean "used exclusively," which is effectively the interpretation they propose. Second, and more important, because the actual cost provision expressly includes equipment required to access unregulated video programming offered on a per channel or per program basis, the cable petitioners' interpretation would produce the rather anomalous result that equipment used to receive unregulated channels would be regulated at actual cost while equipment used in part to receive regulated cable programming service channels would be regulated more leniently, *viz.*, only to prohibit rates that are "unreasonable." The cable petitioners have not been able to offer a convincing explanation for why the Congress would have intentionally created such an odd arrangement.

The cable petitioners are not, however, without some support in the statute for their position. They note that "cable programming service" is defined as:

any video programming over a cable system, regardless of service tier, including installation or rental of equipment used for the receipt of such video programming, other than (A) video programming carried on the basic service tier, and (B) video programming offered on a per channel or per program basis.

47 U.S.C. § 543(*l*)(2). They make much of the phrase "equipment used for the receipt of such video programming," arguing that it means that any equipment used to receive

cable programming service falls within the "unreasonable rate" standard of regulation applicable to cable programming service, *see* 47 U.S.C. § 543(c), rather than the "actual cost" standard of § 543(b)(3). Although focusing upon that phrase might at first seem to help the petitioners' cause, it begs the ultimate question; both § 543(b)(3) and § 543(*l*)(2) refer to the equipment "used" to receive programming, so the question is which one effectively means "used exclusively?" The cable petitioners and the Commission each have their candidate, of course— the Commission wins if § 543(*l*)(2) receives the additional modifier, the cable companies if that limitation applies to § 543(b)(3)—and neither suggestion is unreasonable.

Although each side cites snippets of legislative history, neither can point to anything remotely close to dispositive. We are therefore left with a virtual dead heat, save for the observation that the cable petitioners' interpretation would produce the more anomalous result. Obviously, the Congress did not address the specific issue before us. Therefore, the FCC having offered a permissible interpretation of the statute, we are bound to accept it. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

### III. Conclusion

For the foregoing reasons, we conclude upon the present record that, with one exception, the Commission's cable rate regulations are neither arbitrary and capricious nor contrary to the charter given the agency in the 1992 Cable Act. Therefore, we grant the cable companies' petitions and vacate the rule insofar as the FCC denied them recovery of their gap-period external cost increases; we deny the cable companies' petitions and those of Blade Communications and of the cities in all other respects concerning rate issues.

*So ordered.*

RANDOLPH, Circuit Judge:

These are consolidated petitions for review of three Federal Communications Commission orders,[1] implementing section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460, 1464–71 (codified at 47 U.S.C. § 543 (Supp. IV 1992)).[2] The question to be decided in this opinion is whether the Commission's rate regulations issued under section 3 of the 1992 Cable Act, 47 U.S.C. § 543, violate the First Amendment rights of the cable operators who are before us as petitioners.[3]

I

Almost from its inception in the 1950s, the cable industry has been subject to some form of rate regulation. Initially, rate regulation generally was administered by municipalities and other local franchising authorities "as a

---

1. The orders are: (1) *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation*, Report and Order and Further Notice of Proposed Rulemaking, 8 F.C.C.R. 5631 (1993) ("Rate Order"); (2) *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation*, First Order on Reconsideration, Second Report and Order and Third Notice of Proposed Rulemaking, 9 F.C.C.R. 1164 (1993) ("First Reconsideration"); and (3) *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation*, Second Order on Reconsideration, Fourth Report and Order and Fifth Notice of Proposed Rulemaking, 9 F.C.C.R. 4119 (1994) ("Second Reconsideration").

2. We have today also issued separate opinions deciding petitioners' challenges to the Commission's rate formulas (opinion of Ginsburg, J.) and the Commission's rules (opinion of Rogers, J.).

3. "Cable petitioners" are Armstrong Holdings, Inc.; Atlanta Cable Partners, L.P.; Benchmark Communications, L.P.; Blade Communications, Inc.; Cable Telecommunications Association; Cablevision Industries Corporation; Century Communications Corporation; Clinton Cable, L.P.; Coalition of Small System Operators; Columbia Associates, L.P.; Comcast Cable Communications, Inc.; Continental Cablevision, Inc.; Cox Cable Communications, Inc.; C–TEC Cable Systems, Inc.; Daniels Cablevision, Inc.; Douglas Communications Corp. II; Falcon Holding Group, L.P.; Georgia Cable Partners; Greater Media, Inc.; Harron Communications Corp.; Horizon Cable I, L.P.; McDonald Investment Company, Inc.; National Cable Television Association, Inc.; Newhouse Broadcasting Corporation; Prime Cable Corp.; TeleCable Corporation; Time Warner Entertainment Company, L.P.; United Video Cablevision, Inc.; Western Communications; and Wometco Cable Corp.

means to prevent cable operators from charging unreasonably high rates." H.R.REP. No. 934, 98th Cong., 2d Sess. 24 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4655, 4661. In 1984, Congress enacted the Cable Communications Policy Act, Pub.L. No. 98–549, 98 Stat. 2779 ("1984 Cable Act"), to "establish a national policy concerning cable communications." 47 U.S.C. § 521(1). With respect to rate regulation, Congress then determined that local governments should be permitted to regulate only the basic service rates of those cable systems that are not subject to "effective competition" as defined by the Commission. *See* S.REP. No. 92, 102d Cong., 1st Sess. 4 (1991) ("Senate Report"); H.R.REP. No. 628, 102d Cong., 2d Sess. 30 (1992) ("House Report"), U.S.Code Cong. & Admin.News 1992, pp. 1133, 1136. The Commission's definition of "effective competition," as implemented in 1986, effectively prohibited local authorities from regulating the rates of cable systems in approximately 96 percent of the nation's communities. House Report at 31; *see also* Senate Report at 4.

Experience under the 1984 Cable Act's deregulatory regime led Congress to enact the 1992 Cable Act. Contrary to Congress's expectation in 1984, competition to cable did not develop from satellite systems (House Report at 26), and a commentator noted that "consumers cannot be worse off than under an unregulated monopoly." Thomas W. Hazlett, *Duopolistic Competition in Cable Television: Implications for Public Policy*, 7 YALE J. ON REG. 65, 86 (1990). In 1992, Congress found that the deregulated cable industry had become the "dominant nationwide video medium," serving "over 60 percent of the households with televisions." 1992 Cable Act, § 2(a)(3). The legislative record also showed that the industry was "highly concentrated." *Id.* § 2(a)(4). In addition, Congress found that "most cable television subscribers have no opportunity to select between competing cable systems," and that "[t]he result is undue market power for the cable operator as compared to that of consumers." *Id.* § 2(a)(2). Congress also found that the average monthly cable rate had increased "almost 3 times as much as the Consumer Price Index since rate deregula-

tion" (*id.* § 2(a)(1); *see also* Senate Report at 4–8), and a Senate committee stated that consumers in some locations were being "gouged by cable operators" (Senate Report at 7, U.S.Code Cong. & Admin.News 1992, p. 1139). Congress concluded that rate reregulation was necessary to ensure that cable operators would not exercise "undue market power vis-a-vis video programmers and consumers." 1992 Cable Act, § 2(b)(5); *see also* Senate Report at 8–9. To that end, in the 1992 Cable Act Congress:

— provided a statutory definition of "effective competition" in order to increase the number of cable operators that are subject to rate regulation (47 U.S.C. § 543(*l*)(1));

— required that the Commission "shall, by regulation, ensure that the rates for the basic service tier are reasonable" in light of statutorily prescribed standards (47 U.S.C. § 543(b)(1), (2));

— established a system for basic service tier rates under which local franchising authorities regulate pursuant to Commission rules (47 U.S.C. § 543(a), (b)); and

— required the Commission to establish a system of exclusive regulation by the Commission, again according to statutorily-prescribed standards, of upper tier "cable programming services" (47 U.S.C. § 543(c)).

Although some of its provisions apply more broadly, the core ratemaking provisions of the 1992 Cable Act are limited in application to cable systems that are not among the three types of systems defined as subject to "effective competition." 47 U.S.C. § 543(a)(2). The three types of systems exempted from rate regulation are: (1) "low penetration systems"—those with subscribership of less than 30 percent of the households in a franchise area (47 U.S.C. § 543(*l*)(1)(A)); (2) "overbuilds"—those subject to actual head-to-head competition with another cable system (47 U.S.C. § 543(*l*)(1)(B)); and (3) "municipal systems"—those operated by municipalities or by private operators that compete with systems operated by municipalities (47 U.S.C. § 543(*l*)(1)(C)). The vast majority of cable systems across the country do not

fall into any of those three categories and hence are subject to rate regulation. The 1992 Cable Act directs the Commission to develop substantive ratemaking standards and procedures to enforce those standards, and requires the Commission, in implementing those directives, to consider an array of factors separately listed in the Act with respect to the "basic service tier" and "cable programming services." *See* 47 U.S.C. § 543(b), (c).

The Act divides categories of cable service into three parts: (1) basic service tier;[4] (2) cable programming service;[5] and (3) video programming offered on a per-channel or per-program basis.[6] The Act directs the Commission to establish regulations to "ensure that the rates for the basic service tier are reasonable," and that the rates for other "cable programming services" are not "unreasonable." 47 U.S.C. §§ 543(b)(1), 543(c)(1).

As to basic service tier, local franchising authorities generally oversee the rates pursuant to standards the Commission sets. *See* 47 U.S.C. §§ 543(a)(2)(A), 543(a)(6). With respect to cable programming services, the Commission alone determines whether those rates are unreasonable. *See* 47 U.S.C. § 543(a)(2)(B). In establishing regulations governing basic service tier rates, the Commission must seek to reduce the administrative burdens on subscribers, cable operators, franchising authorities, and itself. *See* 47 U.S.C. § 543(b)(2)(A). The Commission implemented three methods of regulating cable

rates on a "tier-neutral" basis, that is, for both the basic service and cable programming service tiers.[7] Rate Order ¶ 396. First, it adopted a benchmark/competitive differential scheme. Then when the initial rates were lowered to a reasonable level, the Commission instituted a price cap. As an alternative to both the benchmark/competitive differential and the price cap, the Commission offered a cost-of-service option.

A benchmark rate is a price against which a given cable system's rate is compared. In adopting a benchmark/competitive differential scheme, the Commission compared data from cable systems that were and were not subject to regulation. The Commission determined that in the aggregate, the price per channel of noncompetitive systems exceeded that of competitive systems by 10 percent. *See* Rate Order ¶ 213. In the Rate Order, the Commission required noncompetitive cable systems to set their rates to conform with the benchmark formula. *Id.* ¶ 214. The Commission arrived at the benchmark formula by determining what rates a similarly situated system operating in a competitive marketplace would charge. *Id.* ¶ 213. If the benchmark formula required a reduction greater than the aggregate competitive differential of 10 percent, the system would only have to lower its rates by 10 percent, rather than reducing them to the benchmark. *Id.* ¶ 217 & n. 544. Also, if the system was at or below the benchmark rate at the time it became subject to regulation, it would not be required to reduce its rates. *Id.* ¶ 216.

4. Section 543(b)(7)(A) provides that the minimum requirements of basic service tier are: the carriage of local commercial television signals; the carriage of noncommercial educational television; public, educational, and governmental access programming required by the franchise of the cable system to be provided to subscribers; and television broadcast station signals provided by the cable operator to any subscriber, except a signal which is secondarily transmitted by a satellite carrier beyond the local service area of such station.

Since the statute only specified minimum requirements, cable operators may add additional video programming signals or services to the basic service tier. *See* 47 U.S.C. § 543(b)(7)(B); *see also* opinion of Rogers, J., at 26–27 (requiring that each cable operator only offer a single basic tier).

5. Cable programming service is defined as "any video programming provided over a cable system . . . other than (A) video programming carried on the basic service tier, and (B) video programming offered on a per channel or per program basis." 47 U.S.C. § 543($l$)(2).

6. Video programming offered on a per-channel or per-program basis, which includes pay-per-view channels and premium channels such as HBO and Showtime, is not subject to rate regulation. *See* 47 U.S.C. §§ 543(a)(2), 543(c)(2)(D) & 543($l$)(2).

7. We briefly introduce the statutory and regulatory scheme of § 3 of the 1992 Cable Act, but the opinion of Ginsburg, J., discusses the scheme in detail.

The Commission largely reaffirmed the Rate Order in the First Reconsideration. In the Second Reconsideration, however, the Commission reanalyzed the data used in the Rate Order and revised the competitive differential to 17 percent. That is, the Commission determined that noncompetitive systems charged 17 percent higher rates, on the average, than their competitive counterparts. The Commission reached this figure by emphasizing more heavily data from the "overbuilds" than data from the low penetrations and municipals, the other competitive systems. *See* Second Reconsideration ¶¶ 90–105. In addition, the Commission determined that all noncompetitive cable systems had to reduce their rates in effect on September 30, 1992, by the revised 17 percent competitive differential, regardless whether they were above the benchmark formula. *Id.* ¶ 109. If a 17 percent reduction placed the cable system's rates below its benchmark rate, the system could seek temporary relief by reducing its rates to the benchmark level until the Commission conducted an industry cost study to determine the appropriateness of the 17 percent reduction. *Id.* ¶ 111 & n. 145.

Once it established the initial reasonable rates, the Commission decided to employ price cap regulation, expressed as a price per channel limit, on a going forward basis. *See* Rate Order ¶¶ 223, 227–29; Second Reconsideration ¶ 169. The price cap formula governed rate changes by capping the rates cable systems could charge, rather than their rates of return. The price cap regime's initial rates were based on the rates produced by either the benchmark/competitive differential or cost-of-service showing. The rate could then move up or down according to a formula that factored annual percentage change in the cost of goods and services in the economy as a whole, as measured by the Gross National Product Price Index and certain other external costs beyond the cable operator's control. Rate Order ¶¶ 239–54. The price caps did not penalize cable operators for adding programming. The price cap scheme allowed adjustments for inflation and full recovery for programming expenses, along with overhead and profit if a company chose to add channels. Second Reconsidera-

tion ¶¶ 245, 248. Under a price cap, companies have an incentive to reduce costs and operate efficiently. By reducing its costs, a company could capture the savings in higher profits.

To alleviate any unduly harsh effect from the required rate reduction, the Commission offered a cost-of-service option as an alternative to the benchmark/competitive differential and the price cap schemes. *See* Second Reconsideration ¶ 162; Rate Order ¶ 270. Those cable systems whose costs were so high that they were unable to lower their rates in accordance with the Commission's benchmark/competitive differential or price cap schemes could choose to set their rates based on their costs and revenues to insure that they realized a reasonable profit. *See* Second Reconsideration ¶ 162 & n. 212. But the Commission noted that cost-of-service regulation could not be the primary means of rate regulation because "applying cost-of-service regulation to thousands of cable systems would impose tremendous administrative burdens on regulatory authorities and cable operators." Rate Order ¶ 392.

## II

The First Amendment forbids some but not all economic regulations affecting speech. Some laws survive so long as they have a rational basis. Other laws will fall unless they rest on some extraordinary justification. Still other laws need to satisfy a standard somewhere between these two extremes. As to the Commission's cable rate regulations, we know from *Turner Broadcasting v. FCC*, —— U.S. ——, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), that rational basis cannot be the test. *Turner Broadcasting* holds that cable operators are entitled to the protection of the First Amendment's command that Congress shall not abridge the freedom of speech, or of the press (*id.* at ——, 114 S.Ct. at 2456); and that laws of less than general application aimed at the press or elements of it are "always subject to at least some degree of heightened First Amendment scrutiny." *Id.* at ——, 114 S.Ct. at 2458; *see Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581, 103 S.Ct. 1365, 1370, 75 L.Ed.2d 295

(1983). The question is what "degree"? The cable petitioners say the scrutiny must be "strict," which means, among other things, that the government's interest must be "compelling" and that the law is presumptively invalid. *See, e.g., Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.,* 502 U.S. 105, 115–16, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991); *R.A.V. v. City of St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2547–49, 120 L.Ed.2d 305 (1992). The Commission and the United States, joined by some of the intervenors, say that an "intermediate" standard is warranted, requiring only an "important or substantial governmental interest" and restrictions no greater than "essential" to further the interest. *See United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

The Supreme Court's decision in *Turner Broadcasting,* applying the less rigorous of the two "heightened" standards to the "must-carry" provision of the 1992 Cable Act, stands rather firmly against the cable petitioners on this point. One frequently-mentioned reason for imposing the more demanding First Amendment standard petitioners advocate is that the law is content-based, that it differentiates "favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2459. No serious claim can be made that the cable rate regulations are of this sort. All cable systems not facing effective competition are covered, and they are covered regardless of the content of the programs they transmit. 47 U.S.C. § 543(a)(2). Neither the 1992 Cable Act nor the Commission's rate regulations have a content-based purpose. Congress became concerned about rising cable rates after it deregulated rates in 1984 (*see* Cable Communications Policy Act of 1984, Pub.L. No. 98–549, § 623, 98 Stat. 2779, 2788–89). The 1992 Cable Act, 47 U.S.C. § 543, sought to promote competition and lower monopolistic cable rates. In compliance with the Act, the Commission focused its cable rate regulation on the method of transporting the speech rather than the speech itself, comparing the rates of competitive cable operators—that is, cable systems lacking bottleneck control over transport service—with those of noncompetitive ones—systems with bottleneck control over transport service.

But if regulating cable rates is not done according to the nature of the programming, it nevertheless may affect the content of programs transmitted, so the cable petitioners tell us. This impact on content, they say, triggers strict scrutiny under *Riley v. National Federation of the Blind of North Carolina, Inc.,* 487 U.S. 781, 791, 108 S.Ct. 2667, 2674, 101 L.Ed.2d 669 (1988). *Riley* is doubtless petitioners' strongest precedent. The state law in that case regulated professional fundraisers in the interest of preventing fraud, capping the percentage of donations fundraisers could retain as their fees for soliciting contributions to charitable organizations. If their fees exceeded 35 percent of the amount collected, the fees were presumed unreasonable, a presumption the fundraisers could rebut by showing that the charge was necessary because they were disseminating information at the charity's behest or because otherwise the charity's ability to raise funds would be significantly impaired. *Id.* at 785–86, 108 S.Ct. at 2671–72. This violated the fundraisers' First Amendment rights. Soliciting charitable contributions is protected speech. *Id.* at 789, 108 S.Ct. at 2673. The burden the cap imposed was, the Court said, "hardly incidental to speech"—"the desired and intended effect of the statute [was] to encourage some forms of solicitation and discourage others." *Id.* at 789 n. 5, 108 S.Ct. at 2674 n. 5. Since the state law constituted "a direct restriction on the amount of money a charity can spend on fundraising activity" and hence "a direct restriction on protected First Amendment activity," *id.* at 788–89, 108 S.Ct. at 2673 (internal quotation marks omitted), the Court subjected the law to "exacting First Amendment scrutiny" and struck it down. *Id.* at 789, 108 S.Ct. at 2673.

The analogy of this case to *Riley* fails at several critical junctures. Neither the "desired" nor the "intended effect" of the cable rate regulations is to encourage some types of speech while discouraging others. The premise of the cable petitioners' argument from *Riley, see also Grosjean v. American Press Co.,* 297 U.S. 233, 244–45, 56 S.Ct. 444,

447, 80 L.Ed. 660 (1936), is that the rate regulations will have a deleterious impact on the content of the programming transmitted. Yet the Commission's study revealed that the content of programming was not one of the three key system characteristics that largely explained the variance in rates charged by cable systems nationwide. *See* Rate Order ¶ 210. Pressure exerted on cable operators to drop expensive programming or to add only inexpensive programming in response to a lowering of their rates is relieved by the Commission's "going forward" rules. A cable operator who adds a channel may "fully recover ... the actual level of programming expense incurred," along with an overhead charge and "a 7.5 percent markup." Second Reconsideration ¶¶ 246, 248. An operator who drops a channel must make a corresponding adjustment. *Id.* ¶ 246. Cable operators thus have no reason to prefer low-quality versus high-quality channels, which is why at least some cable programmers favored the Commission's approach. *Id.* ¶ 240.[8] Whatever impact rate regulation might have on the content of cable programming is, moreover, considerably less significant than the effect on content of the must-carry rules considered in *Turner Broadcasting.* The must-carry rules required cable operators to devote about one-third of their channels to broadcasters and to transmit the programming the broadcasters selected, yet *Turner Broadcasting* held that intermediate, rather than strict, scrutiny applied. The cable rate regulations, on the other hand, merely require cable operators to charge reasonable rates. As to the regulations' potential for causing incidental effects on content, the Commission adequately insulated cable operators through the cost-of-service option and, as we have mentioned, through incentives to expand cable programming. *Cf. National Cable Television Ass'n v. FCC,* 33 F.3d 66, 70–71 (D.C.Cir.1994).

We accept, *arguendo,* the cable petitioners' contention that the government could not, consistently with the First Amendment, cap the price of a newspaper at 25 cents in order to limit monopoly profits and make the paper more affordable. But it does not follow that cable rate regulations must also be strictly judged. Cable systems are not functionally equivalent to newspapers. As we learned from *Turner Broadcasting,* the First Amendment's prohibition against a law requiring a newspaper to carry "that which it would not otherwise print" (*Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974)), does not mean that a law requiring a cable system to carry broadcast programs is also unconstitutional, or that such a law is to be tested as if it governed newspapers. Strict scrutiny of laws directed only at one element of the media is unwarranted if the difference in treatment is " 'justified by some special characteristic' " of the medium. *Turner Broadcasting,* ―― U.S. at ――, 114 S.Ct. at 2468 (quoting *Minneapolis Star,* 460 U.S. at 585, 103 S.Ct. at 1372). That cable rate regulation is so justified is plain. Congress found that "[f]or a variety of reasons, including local franchising requirements and the extraordinary expense of constructing more than one cable television system to serve a particular geographic area, most cable television subscribers have no opportunity to select between competing cable systems." Pub.L. No. 102–385, § 2(a)(2), 106 Stat. 1460, 1460 (1992). The monopolies most cable operators now enjoy resulted from exclusive franchises granted by local authorities. *See* Thomas W. Hazlett, *Duopolistic Competition in Cable Television: Implications for Public Policy,* 7 YALE J. ON REG. 65, 65 (1990); *but see* Albert K. Smiley, *Regulations and Competition in Cable Television,* 7 YALE J. ON

---

**8.** The Commission created further incentives for cable operators to add new channels in *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Sixth Order on Reconsideration, Fifth Report and Order and Seventh Notice of Proposed Rulemaking, 76 Rad.Reg.2d (P & F) 859 (1994) ("Sixth Reconsideration"). The Commission allowed operators to increase rates by a fixed amount per month per channel as an alter-native to a percentage mark-up, thereby creating an incentive for the operators to add inexpensive or cost-free channels. Sixth Reconsideration ¶¶ 54–98. Also the Commission allowed operators to add "new product tiers" beyond the currently existing basic and non-basic tiers for which the operators can charge any rate as long as existing service is not fundamentally changed and subscribers affirmatively request a new tier. *Id.* ¶¶ 16–37.

REG. 121 (1990). Exclusive franchising ended in 1992 (*see* 47 U.S.C. § 541(a)(1)), but the effects linger on. While newspapers in some localities also may lack effective competition, this is not due to actions of the government. Furthermore, there is "an important technological difference between newspapers and cable television." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2466. A newspaper, no matter how secure its monopoly, is incapable of blocking its readers' access to competing publications. A cable operator, by contrast, has "bottleneck, or gatekeeper control over most (if not all) of the television programming that is channeled into the subscriber's home" because the operator owns and controls the transmission facility. *Id.* Cable service thus involves more than programming; it includes as well a transportation element. *Id.* at ——, 114 S.Ct. at 2452. When a cable operator has a monopoly in a franchise area, that operator has exclusive control over the transportation element. This is why the Commission set its benchmark by examining the rates cable operators charged in competitive markets, that is, those markets where this exclusive control over the transportation element did not exist. Neither the benchmark/competitive differential nor the price cap depended on the content of speech and the administration of the benchmark/competitive differential and the price cap requires no reference to the content of speech.[9]

Like the must-carry rules in *Turner Broadcasting,* the cable rate regulations thus "are not structured in a manner that carries the inherent risk of undermining First Amendment interests." —— U.S. at ——, 114 S.Ct. at 2468. The fact that the regulations apply only to cable systems does not make them especially suspect. As economic measures that may incidentally affect speech,

the rate regulations must be analyzed by the same "intermediate" standard the Supreme Court applied in *Turner Broadcasting.* That is, the government's interest must be important or substantial and the means chosen to promote that interest must not substantially burden more speech than necessary to achieve the government's aims, *id.* at ——, 114 S.Ct. at 2469, or as the Supreme Court phrased it in an earlier decision, the regulations must "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985). As we next discuss, the regulations satisfy this standard.

### III

▮ The government's interest in regulating cable rates is evident—protecting consumers from monopoly prices charged by cable operators who do not face effective competition. One need look no further than *Turner Broadcasting* to determine that this interest is to be treated as "important or substantial": "the Government's interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment." —— U.S. at ——, 114 S.Ct. at 2470. Congress had before it evidence showing that "the cable television industry has become a dominant nationwide video medium." 1992 Cable Act, Pub.L. No. 102–385, § 2(a)(3), 106 Stat. 1460. Cable systems serve 60 percent of American households, yet only a small percentage of the approximately 11,000 cable operators in the country face competition from other cable service providers. *Id.* § 2(a)(2); Rate Order

---

9. There is nothing to the cable petitioners' argument for strict scrutiny on the basis that the rate regulations render cable operators dependent on official discretion, forcing them to curry the regulators' favor by engaging in self-censorship. *See Forsyth County v. Nationalist Movement,* 505 U.S. 123, ———–—— & n. 10, 112 S.Ct. 2395, 2402–03 & n. 10, 120 L.Ed.2d 101 (1992); *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 770, 108 S.Ct. 2138, 2151, 100 L.Ed.2d 771 (1988). The Commission's rate regulations do

not leave room for preferential treatment of a particular cable operator. While the 1992 Cable Act authorized the Commission to determine the initial level of rate reduction, once this was done the 17 percent reduction was to apply evenhandedly, without regard to programming content. If the 17 percent reduction turns out to be too onerous for a cable system, that system can choose the cost-of-service alternative, a choice that is open to all noncompetitive systems and that operates according to well-established principles.

¶ 15 n. 30. After the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, § 623, 98 Stat. 2779, 2788–89, deregulated the industry, the "average monthly cable rate ... increased almost 3 times as much as the Consumer Price Index." 1992 Cable Act, § 2(a)(1). Congress found that "[w]ithout the presence of another multi-channel video programming distributor, a cable system faces no local competition. The result is undue market power for the cable operator as compared to that of consumers and video programmers." *Id.* § 2(a)(2).

Although cable petitioners "doubt the asserted premise of *pervasive* monopoly pricing," Cable Petitioners Rate Brief at 50, Government Accounting Office studies sufficiently support it. An August 1989 General Accounting Office survey revealed an average cable "rate increase of over 25% in about 2 years." S.REP. No. 138, 102d Cong., 1st Sess. 5 (1991). The survey, some believed, may have underestimated the rate increases because: "(1) the systems with large increases did not respond to the survey; and (2) the systems with no significant increases not only responded in great number but also many of these systems may have received increases from the franchising authority prior to deregulation." *Id.* The cable petitioners think that only per-channel rate increases should be considered: since channel offerings increased from 24 to 30 while rates increased

by 29 percent, there had been only a 3.2 percent per-channel rate increase, significantly lower than the Consumer Price Index. But per-channel figures are misleading because, the Commission found, "economies of scale ... arise as operators add channels to their systems." Second Reconsideration ¶ 40. As a cable operator adds more channels (most did in the 1980s), the operator's fixed costs are spread over additional channels and its per-channel fixed costs decline. Cable operators estimated their fixed costs at $20 per month per subscriber for basic service. *Id.* ¶ 189. Absent evidence that the marginal cost of channels added during the 1980s was unusually high, the fact that per-channel rates increased at all is thus not helpful to the cable petitioners' cause.

▮ Since the government's interest is substantial, the remaining question deals with the manner in which the rate regulations seek to promote that interest.[10] Do the regulations "burden substantially more speech than is necessary"? *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989). We shall assume that rules requiring cable operators to charge reasonable rates burden speech, although it is by no means clear how they do so.[11] Still, the rate regulations are narrow enough: rate regulation is triggered by the absence of effective competition and ceases when effective competition emerges. The

---

**10.** Congress defined "effective competition" to include situations in which "fewer than 30 percent of the households in the franchise area subscribe to the cable service of a cable system," 47 U.S.C. § 543(*l*)(1). Such "low penetration systems" are therefore not subject to rate regulation even though, as the Commission found, their rates "are not statistically different as a group from the rates of systems subject to rate regulation." Second Reconsideration ¶ 28. The cable petitioners think this shows that the rate regulations are not tailored "to the extent of any problem of monopoly pricing." Cable Petitioners Rate Brief at 52. There is, they say, a "mismatch" between the problem and the solution. *Id.* at 53. The cable petitioners make a similar argument based upon the observation that for large systems (5,000 or more subscribers) the average rate is no greater among the regulated than among their unregulated counterparts. In the opinion for the court written by Judge Ginsburg, we explain in detail why the Commission's treatment of the data for low penetration and large systems was neither arbitrary and capri-

cious nor in violation of the 1992 Cable Act. For the reasons discussed there, we also conclude here that the Commission's treatment of those data does not raise any First Amendment concerns. Because *regulated large systems and low penetration systems* may, as the FCC reasonably concluded, have significant market power and therefore charge supracompetitive rates, and because the Commission established the cost-of-service option as a protective safety-valve for individual systems, there was no mismatch between the problem and the Commission's solution.

**11.** The cable petitioners do not claim that the Commission should have determined the actual effects on speech that its rate regulations will cause. While the plurality opinion in *Turner Broadcasting*, —— U.S. at ——, 114 S.Ct. at 2472, required the district court to make such findings on remand, petitioners' failure to raise the point in this court or before the Commission renders it unnecessary for us to consider it.

Commission points out that it has taken steps designed to ensure that cable rate regulation will be of limited duration. As the cable petitioners recognize, "the Government is vigorously promoting the provision of video service through telephone-company wires (*e.g.*, through video dialtone service)." Cable Petitioners Rate Brief at 47 n. 38. In the meantime, the Commission's benchmark establishes a level above which rates are presumed unreasonable.[12] If any operator believes that it would be justified in charging higher rates, there is a safety valve: the operator may invoke the cost-of-service option. This ensures that every cable operator will be able to recover its reasonable costs and earn an 11.25 percent rate of return on investment. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation and Adoption of a Uniform Accounting System for Provision of Regulated Cable Service*, Report and Order and Further Notice of Proposed Rulemaking, 9 F.C.C.R. 4527, 4612 ¶ 147 (1994). While cost-of-service proceedings will cause operators to incur expenses, this does not render the regulations more restrictive than necessary. The obvious alternative to the Commission's system—holding a cost-of-service proceeding for each regulated cable system—would also cause operators to incur expenses and would

in any event be unworkable in light of administrative burdens such a scheme would entail. Rate Order ¶ 392.[13]

\* \* \*

The cable rate regulations are subject to intermediate scrutiny under the First Amendment and are not unconstitutional. The government has demonstrated a substantial interest in reducing cable rates and the Commission's regulations issued pursuant to section 3 of the 1992 Cable Act are narrowly tailored to meet that interest. To this extent,

*The petitions for review are denied.*

ROGERS, Circuit Judge:

In these consolidated appeals from orders of the Federal Communication Commission implementing the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460 (codified in scattered sections of 47 U.S.C.) (the "1992 Cable Act"), this opinion addresses challenges to the Commission's rules by a number of cable operators (the "cable petitioners") and several cities ("the Cities") as well as separate challenges by Armstrong Holdings, Inc. ("Armstrong") and the Small Cable Business Association ("Association").[1] The

---

**12.** Cable petitioners complain that in revising its initial competitive differential from 10 percent to 17 percent, the Commission employed guesswork and made a number of arbitrary assumptions. Our separate rate opinion fully addresses this complaint. *See* opinion of Ginsburg, J., at 6–16. Suffice it to say that in formulating the revised competitive differential, the Commission gave the greatest weight to the data from overbuilds and that it adequately explained why it did not give equal weight to the other two types of systems not subject to rate regulation under the 1992 Cable Act. *See* Second Reconsideration ¶¶ 29–30, 95–101. The statute itself only requires the Commission to "take into account" or "consider" the rates of systems subject to "effective competition." 47 U.S.C. §§ 543(b)(2)(C), 543(c)(2).

**13.** Because we do not believe the rate regulations raise any "grave" constitutional question, we do not decide whether the presence of such a question should alter the usual deference paid to the Commission's construction of a statute it administers.

**1.** The "cable petitioners" refers to petitioners Armstrong Holdings, Inc.; Atlanta Cable Part-

ners, L.P.; Benchmark Communications, L.P.; Blade Communications, Inc.; Cable Telecommunications Association; Cablevision Industries Corporation; Century Communications Corporation; Clinton Cable, L.P.; Coalition of Small System Operators; Columbia Associates, L.P.; Comcast Cable Communications, Inc.; Continental Cablevision, Inc.; Cox Cable Communications, Inc.; C–TEC Cable Systems, Inc.; Daniels Cablevision, Inc.; Douglas Communications Corp. II; Falcon Holding Group, L.P.; Georgia Cable Partners; Greater Media, Inc.; Harron Communications Corp.; Horizon Cable I, L.P.; McDonald Investment Company, Inc.; National Cable Television Association, Inc.; Newhouse Broadcasting Corporation; Prime Cable Corp.; TeleCable Corporation; Time Warner Entertainment Company, L.P.; United Video Cablevision, Inc.; Western Communications; and Wometco Cable Corp. The "Cities" refers to petitioners Austin, Texas; Dayton, Ohio; Dubuque, Iowa; King County, Washington; Miami Valley Cable Council; Montgomery County, Maryland; St. Louis, Missouri; and Wadsworth, Ohio.

Commission promulgated the rules under § 3 of the 1992 Cable Act, 47 U.S.C. § 543 (Supp. IV 1992), which generally addresses "rate regulation."

In essence, the cable petitioners contend that the Commission's rules carry regulation too far by targeting categories of cable operators and services that Congress intended to spare from the 1992 Cable Act's rate regime. The Cities, in contrast, primarily contend that the Commission's rules unduly *restrict* cable regulation by limiting local government supervision of the cable industry. Armstrong and the Association raise concerns relating to the impact of the rate regulations on single tier operators and the Commission's compliance with the Small Business Act[2] and the Regulatory Flexibility Act.[3]

We conclude that the Commission's rules misconstrue or misapply the 1992 Cable Act in four ways. First, the Commission construed the term "effective competition" too narrowly, contrary to the definition adopted by Congress. Second, the Commission erred in concluding that the requirement for a uniform rate structure applies to all systems, including those facing effective competition and not otherwise subject to rate regulation under the statute. Third, the Commission's conclusion that the statute's tier buy-through provision applies to systems subject to effective competition conflicts with the structure and the language of the statute. Fourth, the Commission exceeded its authority by requiring franchising authorities to fund rate regulations out of franchise fees. The additional challenges by the cable petitioners and the Cities are either meritless or unripe for judicial review. Finally, we conclude that the separate challenges by Armstrong and the Association are not properly before the court.

## I.

**Challenges to the Commission's Rules.** In deciding whether the Commission's rules challenged by the cable petitioners and the cities are permissible, we apply the standard of review set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694

(1984). If Congress has spoken to the particular question at issue, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. at 2782. If, on the other hand, Congress has not spoken and the statute is either "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* Finally, if Congress has expressly delegated authority to the agency to fill a particular gap in the statute, we must affirm the ensuing regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782.

**A. Structure of Section 543.** Because the rules challenged by the cable petitioners and the Cities involve the Commission's interpretation of § 3 of the 1992 Cable Act, 47 U.S.C. § 543, it is instructive to provide some background on the structure and purpose of this section. Since the advent of cable television, Congress has considered the extent to which the federal and local governments should regulate the evolving medium. Prior to 1984, an amalgam of state, local, and federal regulations governed the cable industry, with most regulation taking place at the local level through the franchise process. *See* H.R.REP. No. 628, 102d Cong., 2d Sess. 29 (1992) (hereinafter "HOUSE REP."). The Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 ("1984 Act"), was designed to establish a national cable policy and to facilitate innovation and competition in the cable industry by limiting rate regulation only to those cable systems that did not face "effective competition" as defined by the FCC. *Id.* § 2, 98 Stat. at 2780, 2788–89. Congress anticipated that the emergence of satellite systems and other forms of video programming competition would increasingly exert competitive pressure on cable prices. *See* H.R.REP. No. 934, 98th Cong., 2d Sess. 22 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4655, 4659; *see generally* HOUSE REP. at 43–47. The 1984 Act ultimately resulted in the deregula-

---

**2.** 15 U.S.C. §§ 631–656 (1988).

**3.** 5 U.S.C. §§ 601–612 (1988).

tion of cable rates in approximately 97% of franchises in the United States. 1992 Cable Act § 2(a)(1), 47 U.S.C. § 521 note (a)(1). Contrary to Congress' expectation, however, competition from satellites and other video sources did not emerge as quickly as expected, and cable operators began to raise cable prices. By 1992, Congress found that the average monthly cable rate had increased "almost 3 times as much as the Consumer Price Index since rate deregulation." *Id.* Congress concluded that rate regulation was necessary to ensure that cable operators would not exercise "undue market power vis-a-vis video programmers and consumers." *Id.* § 2(b)(5), 47 U.S.C. § 521 note (b)(5).

Nevertheless, in the 1992 Cable Act Congress expressed a clear preference for competition rather than rate regulation. In the legislative findings accompanying the 1992 Cable Act, Congress stated that it wished (1) to "promote the availability to the public of a diversity of views and information . . . ," (2) to "rely on the marketplace, to the maximum extent feasible, to achieve that availability," and (3) "where cable television systems are not subject to effective competition, [to] ensure that consumer interests are protected in the receipt of cable service." *Id.* § 2(b)(1), (2) & (4), 47 U.S.C. § 521 note (b)(1), (2) & (4). Congress thus looked first to the marketplace as the source of rate discipline, and only secondarily to government regulation.

The "rate regulation" section of the statute, 47 U.S.C. § 543, bears out this emphasis on competition. In addition to prohibiting the Commission, states, and local governments from regulating rates other than as provided in the statute, *id.* § 543(a)(1), Congress expressly exempted the rates of all systems facing "effective competition" from regulation by the Commission or franchising authorities "under this section." *Id.*

§ 543(a)(2). For systems not facing "effective competition," local franchising authorities (and in certain circumstances, the Commission) would regulate rates for the basic service tier under § 543(b)[4] and the Commission would regulate cable programming rates under § 543(c).[5] *Id.* Congress also adopted, among other provisions, a requirement that cable operators offer a uniform rate structure throughout a franchise area, 47 U.S.C. § 543(d), and a prohibition on "negative option billing," namely, "charg[ing] a subscriber for services that the subscriber has not affirmatively requested by name." *Id.* § 543(f).

With this policy and structure in mind, we turn to petitioners' challenges to the Commission's rules. In deciding whether the Commission's interpretations comport with the 1992 Cable Act, we consider "the language and design of the statute as a whole," *American Scholastic TV Programming v. FCC,* 46 F.3d 1173, 1177 (D.C.Cir. 1995) (quoting *Fort Stewart Schools v. FLRA,* 495 U.S. 641, 645, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990)), recognizing that "congressional intent can be understood only in light of the context in which Congress enacted a statute and of the policies underlying its enactment." *Tataranowicz v. Sullivan,* 959 F.2d 268, 276 (D.C.Cir.1992).

**B. Cable petitioners' challenges.**

**1. Redefinition of Effective Competition.** Section 543(*l*)(1) defines three types of systems that are subject to "effective competition" and therefore exempt from the Commission's rate-setting scheme: low-penetration systems, overbuild systems, and municipal systems. 47 U.S.C. § 543(*l*)(1). Under the statute, a system qualifies as an overbuild if its franchise area is—

---

**4.** The "basic service tier" is the tier of programming that includes the following: all of the signals carried in fulfillment of the "must-carry" requirements of 47 U.S.C. §§ 534, 535; any public, educational and governmental access ("PEG") channels required by the franchising authority; any television broadcast signals provided by the cable operator except signals that are secondarily transmitted by a satellite carrier beyond the local service area; and any other

programming that the cable operator chooses to provide. *Id.* § 543(b)(7).

**5.** 47 U.S.C. § 543(*l*)(2) provides:

The term "cable programming service" means any video programming provided over a cable system, regardless of service tier, . . . other than (A) video programming carried on the basic service tier, and (B) video programming offered on a per channel or per program basis.

(i) served by at least two unaffiliated multichannel video programming distributors each of which offers comparable video programming to at least 50 percent of the households in the franchise area; and

(ii) the number of households subscribing to programming services offered by multichannel video programming distributors [6] other than the largest multichannel video programming distributor exceeds 15 percent of the households in the franchise area. . . .

*Id.* § 543(*l* )(1)(B).

 In the challenged rulemaking implementing § 543(*l* )(1), the Commission concluded that in determining whether 15% of households in the franchise area subscribe to cable services for purposes of § 543(*l* )(1)(B)(ii), "only those multichannel video programming distributors that offer programming to at least 50 percent of the households in the franchise area should be included. . . ." *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Report and Order and Further Notice of Proposed Rulemaking, 8 F.C.C.R. 5631, 5664–65 (1993) ("*Rate Order*"); *see also Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Third Order on Reconsideration, 9 F.C.C.R. 4316, 4321 (1994) ("*Third Reconsideration*"). The Commission reasoned that inclusion of other, non-ubiquitous cable systems in calculating the 15% subscribership would cause anomalous results:

[Such an approach] would permit a cable company to escape rate regulation even if it faced only a single, ineffective competitor in a majority of its territory, along with a variety of niche competitors to whom it would not necessarily be compelled to provide a competitive response and to whom

few of its customers could turn for a competitive alternative. Moreover, in light of the almost universal "offering" of multichannel satellite service, [petitioners'] proposal would make the 15% actual subscribership test the sole determinative factor in almost all situations, rendering [47 U.S.C. § 543(*l* )(1)(B)(i) ] superfluous.

*Third Reconsideration,* 9 F.C.C.R. at 4321.

We agree with the cable petitioners that the Commission's redefinition of overbuilds, although theoretically sound, conflicts with the plain language of the statute. The two overbuild criteria operate independently, and Congress did not limit the 15% threshold in § 543(*l* )(1)(B)(ii) to those cable systems that satisfy § 543(*l* )(1)(B)(i). By its plain terms, the 1992 Cable Act requires the Commission to include the customers of "multichannel video programming distributors other than the largest" in making the 15% subscribership calculation. The statute does not refer to "multichannel video programming distributors mentioned in § 543(*l* )(1)(B)(i) other than the largest," or "*such* multichannel programming distributors other than the largest;" it does not limit in any way the multichannel video programming distributors to be considered in aggregating subscribership. Nor was Congress blind to the existence of satellite providers. Had Congress intended to disqualify as overbuilds those systems that faced only a satellite competitor in at least 50% of their franchise area, it could have done so expressly. Instead, Congress explicitly listed satellite providers among the "multichannel video programming distributors" to be considered in calculating both the 50% and 15% figures. *See* 47 U.S.C. § 522(12). Consequently, the Commission erred by narrowing the overbuild definition of "effective competition" enacted by Congress. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.[7]

---

6. 47 U.S.C. § 522(12) provides:
 The term "multichannel video programming distributor" means a person such as, but not limited to, a cable operator, a multichannel multipoint distribution service, a direct broadcast satellite service, or a television receive-only satellite program distributor, who makes available for purchase, by subscribers or customers, multiple channels of video programming.

7. The Congressional committee reports cited in the Commission's brief offer no guidance on the interpretation of the overbuild definition. *See* H.R.Conf.Rep. No. 862, 102d Cong., 2d Sess. 62 (1992), U.S.Code Cong. & Admin.News 1992, p. 1244 (hereinafter "Conf.Rep."); House Rep. at 89. As the Commission noted in the *Rate Order,* because of Congress's simplifying assumption that systems in most franchise areas will face only

The Commission does not contend that petitioners' interpretation would lead to "absurd results." *Cf. American Water Works Ass'n v. EPA,* 40 F.3d 1266, 1270 (D.C.Cir.1994) (quoting *Chemical Manufacturers Ass'n v. Natural Resources Def. Council, Inc.,* 470 U.S. 116, 126, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985)). Rather, it maintains that its interpretation better advances the goals of the 1992 Cable Act. Had Congress not provided "a precise definition ... for the exact term the Commission now seeks to redefine," *ACLU,* 823 F.2d at 1568, the Commission's interpretation might well be entitled to deference. In the face of a clear statutory definition, however, there is no occasion for deference. *See Public Employees Retirement Sys. v. Betts,* 492 U.S. 158, 171, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989); *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986); *Chevron,* 467 U.S. at 842–843, 104 S.Ct. at 2781–82. Because it conflicts with the clear language of the 1992 Cable Act, the Commission's attempt to recast the overbuild definition for effective competition is invalid.

**2. Uniform rate structure.** Section 543(d) provides:

A cable operator shall have a rate structure, for the provision of cable service, that is uniform throughout the geographic area in which cable service is provided over its cable system.

47 U.S.C. § 543(d). The Commission initially determined that the focus of this "uniform rate structure" provision "is properly on regulated systems in regulated markets," *i.e.,* systems that do not face effective competition as defined by the 1992 Cable Act. *Rate Order,* 8 F.C.C.R. at 5896. Although con-

cluding that the language of the statute "does not provide a specific answer" to whether the rate structure provision applies to competitive systems, the Commission decided that exempting such systems comports with "[t]he general thrust" of the 1992 Cable Act, which is to decrease regulation as markets grow more competitive. *Id.*[8]

Upon reconsideration, however, the Commission decided that the uniform rate structure provision applies not only to regulated systems, but also to systems subject to effective competition and otherwise exempt from rate regulation under the 1992 Cable Act. *Third Reconsideration,* 9 F.C.C.R. at 4327. The Commission reasoned that the harms targeted by the uniform rate provision— "charging different subscribers different rates with no economic justification and unfairly undercutting competitors' prices"—exist equally in areas where "effective competition," as defined by the 1992 Cable Act, exists. *Id.* To exempt such operators from the uniform rate requirement, the Commission concluded, "would not only permit the charging of noncompetitive rates to consumers that are unprotected by either rate regulation or competitive pressure on rates, but also stifle the expansion of existing, especially nascent, competition." *Id.*

As petitioners argue, the Commission's interpretation of the uniform rate structure provision conflicts with the plain language, structure, and legislative purpose of the 1992 Cable Act. Application of the uniform rate provision to competitive systems violates 47 U.S.C. § 543(a)(2), which prohibits the Commission and franchising authorities from utilizing their rate regulation authority under the 1992 Cable Act to regulate the rates charged by cable systems facing "effective competition."[9] The fact that

one competing system offering multichannel video programming, "[n]either report addresses the specific issue confronting us here: how to measure the subscribership if there is more than one competitive multichannel video programming distributor in the franchise area." 8 F.C.C.R. at 5664 n. 116.

8. Contrary to the cable petitioners' suggestion, the Commission based its initial decision not to apply the uniform rate structure provision to competitive systems on the "general thrust" of

the 1992 Cable Act, rather than on a conclusion that § 543(a)(2) expressly governed the rate structure provision. Thus, although the Commission did, on reconsideration, change its ultimate conclusion as to the applicability of the uniform rate provision to competitive systems, it did not, as petitioners suggest, reverse itself as to whether § 543(a)(2) governs.

9. 47 U.S.C. § 543(a)(2) provides:

If the Commission finds that a cable system is subject to effective competition, the rates for

§ 543(a)(2) does not specifically mention the uniform rate structure provision does not change this conclusion. The subsection exempts competitive systems not only from the regulation of basic and cable programming rates under § 543(b) & (c), but from any rate regulation that the Commission or franchising authorities promulgate "under this section [543]." Furthermore, as petitioners point out, the 1992 Cable Act announces a goal of "ensur[ing] that consumer interests are protected in receipt of cable service" where "cable television systems are not subject to effective competition." 47 U.S.C. § 521 note (b)(4). Given so clear a preference for competition, it is hardly surprising that the congressional intent to exempt competitive systems is evidenced as well in the legislative history. *See, e.g.,* SEN.REP. No. 92, 102d Cong., 1st Sess. 63 (1991) U.S.Code Cong. & Admin.News 1992, p. 1196. ("Rate regulation is permitted only in the absence of effective competition.").

Section 543(d)'s mandate that cable operators charge uniform rates is clearly a form of rate regulation. Absent a requirement for uniformity throughout a geographic area, a cable operator would be free to charge either such different rates as the market would bear or uniform rates. In either event, the choice would be that of the operator, not the Commission.

■ Consequently, because § 543(d) regulates rates within the meaning of § 543(a)(2), we conclude that the Commission's uniform rate structure regulation is contrary to the statute insofar as it applies to cable operators subject to "effective competition." By requiring competitive systems to charge uniform rates, the Commission undermines a hallmark purpose of the 1992 Cable Act: to allow market forces to determine the rates charged by cable systems that are sub-

ject to "effective competition" as defined by Congress. In other words, where "effective competition" exists, the consumer is left to the wiles of the marketplace; both the language and the purpose of the 1992 Cable Act make clear that the rates charged by such systems are beyond the Commission's regulatory reach. The Commission's arguments highlighting problems with the choice made by Congress are insufficient to overcome this clear evidence of congressional intent.

■ Having concluded that the uniform rate provision applies only in the absence of "effective competition," we reject petitioners' contention that the Commission acted arbitrarily and capriciously in denying cable operators' request for a "meeting competition" defense to the uniform rate provision where it applies. In the proceedings before the Commission, cable operators had sought authority to negotiate rates on a building-by-building basis with multiple dwelling units in order to match offers made by other multi-channel video producers. *Third Reconsideration,* 9 F.C.C.R. at 4325.[10] The Commission concluded that the 1992 Cable Act is "unequivocal in requiring uniformity of rates within a franchise area" and accordingly rejected the cable operators' proposal.

Although, as the cable petitioners point out, courts have recognized "meeting competition" as a justifiable objective in certain contexts, there is no authority requiring a "meeting competition" defense whenever a statute prohibits discrimination in pricing. *Standard Oil Co. v. FTC,* 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951), upon which petitioners primarily rely, involved the Robinson–Patman Act, which specifically provides a "meeting competition" exception to its price nondiscrimination requirement. *See id.* at 241–243, 71 S.Ct. at 245–246; 15 U.S.C.

the provision of cable service by such system shall not be subject to regulation by the Commission or by a State or franchising authority under this section. If the Commission finds that a cable system is not subject to effective competition—

 (A) the rates for the provision of basic cable service shall be subject to regulation ... in accordance with the regulations prescribed by the Commission under subsection (b) of this section; and

 (B) the rates for cable programming services shall be subject to regulation by the Commission under subsection (c) of this section.

**10.** The Commission allowed cable operators to offer nonpredatory bulk discounts to multiple dwelling units as long as they were offered on a uniform basis across the franchise area. *Rate Order,* 8 F.C.C.R. at 5897, 5898.

§ 13(b). The decision in *Standard Oil* turned on statutory interpretation and does not stand for the broad proposition, which petitioners now advance, that "meeting competition" is required in any rate nondiscrimination scheme. Moreover, the fact that the Commission has allowed a "meeting competition" defense to the common carrier nondiscrimination provision of the Communications Act, 47 U.S.C. § 202(a), does not mean that a meeting competition defense is required here. As the Commission points out, § 202(a) prohibits only "unjust or unreasonable" rate discrimination; the 1992 Cable Act, in contrast, bars discrimination of any type. *Compare* 47 U.S.C. § 202(a) *with* 47 U.S.C. § 543(d). The Commission's decision to allow a "meeting competition" defense for common carriers but not cable operators is therefore not irrational, but is justified by differences in statutory language. Because the Commission's refusal to allow a "meeting competition" defense comports with the language of the 1992 Cable Act and is not otherwise barred by relevant precedent, petitioners' "meeting competition" challenge fails.

 **3. Tier buy-through.** Section 543(b)(8)(A) prohibits cable operators from requiring a "buy-through" of any tier other than the basic tier as a prerequisite for purchase of per program or per channel video programming:

> A cable operator may not require the subscription to any tier other than the basic service tier required by paragraph (7) as a condition of access to video programming offered on a per channel or per program basis. A cable operator may not discriminate between subscribers to the basic service tier and other subscribers with regard to the rates charged for video programming offered on a per channel or per program basis.

47 U.S.C. § 543(b)(8)(A). The Commission, in its *Third Reconsideration,* concluded that the tier buy-through provision applies not only to regulated systems, but also to systems subject to "effective competition" and thus not subject to rate regulation under the 1992 Cable Act. 9 F.C.C.R. at 4328; 47 C.F.R. § 76.921.

The Commission's expansive interpretation of the tier buy-through provision is not permissible under the 1992 Cable Act. First, the provision appears within § 543(b), a subsection that generally focuses upon regulating basic tier rates of systems not facing effective competition. *See* 47 U.S.C. § 543(a)(2) ("If ... a cable system is not subject to effective competition ... the rates for the provision of basic cable service shall be subject to regulation ... under [47 U.S.C. § 543(b) ]."); 47 U.S.C. § 543(b)(1) ("[R]egulations [promulgated by the Commission to ensure reasonable basic rates] shall be designed to ... protect[ ] subscribers of any cable system that is not subject to effective competition from rates for the basic service tier that exceed the rates that would be charged ... if such cable system were subject to effective competition."). Perhaps more importantly, the tier buy-through provision is inextricably intertwined with the immediately preceding provision, entitled "Components of the basic tier subject to rate regulation," which clearly applies only to systems not subject to effective competition. *See* 47 U.S.C. § 543(b)(7). The text of the tier buy-through provision illustrates the close relationship between these two provisions: it expressly references § 543(b)(7) and provides that only the basic service tier required by that section can be required as a condition of access to per channel programming. That § 543(b)(7) applies only to regulated systems is made clear by § 543(b)(7)(B), which provides that any additional, optional signals placed upon the basic service tier "shall be provided to subscribers at rates determined under the regulations prescribed by the Commission under this subsection." *Id.* § 543(b)(7)(B). Because this provision applies to any basic tier established pursuant to § 543(b)(7) and clearly states an intention directly to regulate rates, it cannot apply to systems that face effective competition. *See id.* § 543(a)(2). Given the close relationship between § 543(b)(7) and the tier buy-through provision, the Commission's interpretation that the latter applies to systems not facing effective competition fails.

**4. Negative Option Billing.** The cable petitioners challenge the Commission's con-

clusion that the statutory prohibition of "negative option billing" does not preempt, but rather may coexist with, state consumer protection laws. Section 543(f) provides:

> A cable operator shall not charge a subscriber for any service or equipment that the subscriber has not affirmatively requested by name. For purposes of this subsection, a subscriber's failure to refuse a cable operator's proposal to provide such service or equipment shall not be deemed to be an affirmative request for such service or equipment.

47 U.S.C. § 543(f). The Commission noted in the *Rate Order* that it would "not preclude state and local authorities from adopting rules or taking enforcement action relating to basic services or associated equipment consistent with the implementing rules we adopt and their powers under state law to impose penalties." *Rate Order*, 8 F.C.C.R. at 5905 n. 1095. On reconsideration, the Commission clarified that although state and local regulation of negative option billing was permissible, such regulation could not interfere with the right of operators to move programming from one tier to another, to the extent that the Commission had deemed such "tier restructuring" protected by the 1992 Cable Act: "We ... affirm that franchising authorities may not regulate tier restructuring in a manner that is inconsistent with the 1992 Cable Act. In particular, local authorities are precluded from regulating negative option billing to prevent tier restructuring regardless of how the local requirement is characterized." *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* First Order on Reconsideration, Second Report and Order, and Third Notice of Proposed Rulemaking, 9 F.C.C.R. 1164, 1209 n. 127 (1993) (citation omitted) (*"First Reconsideration "*).[11]

██ In the *Third Reconsideration,* the Commission further addressed the extent to which state and local authorities should have concurrent jurisdiction over negative option billing. The Commission pointed to § 8 of the 1992 Cable Act, which provides: "Nothing in this title shall be construed to prohibit any State or franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this title." 106 Stat. 1484; *see* 47 U.S.C. § 552(c)(1).[12] Concluding that the proscription of negative option billing is a consumer protection measure rather than rate regulation, the Commission decided that state and local regulation of negative option billing is not barred by 47 U.S.C. § 543(a)(1), but rather is "concurrent with the Commission's jurisdiction to regulate negative option billing under the Communications Act." *Third Reconsideration,* 9 F.C.C.R. at 4360–4361. Under the Commission's interpretation, state and local governments may enforce their negative option billing laws and other consumer protection regulations so long as the enforcement does not "approach[ ] actual regulation of 'rates for the provision o[f] cable service'" by frustrating the rate scheme designed by the Commission.[13]

**11.** The Commission had previously determined that "a change in the mix of channels in a tier, including additions or deletions of channels, will not be subject to the negative option billing provision, unless [it] change[s] the fundamental nature of the tier. ... [O]perators need this flexibility to modify and upgrade their offerings in response to marketplace changes." *Rate Order,* 8 F.C.C.R. at 5906. If the Commission had allowed the blanket application of state and local negative option billing laws to all tier changes implemented by cable operators, local authorities could, in theory, take action against cable operators for making even minor modifications unless the consumer affirmatively requested such changes.

**12.** In the codified version of this subsection, the word "subsection" appears in place of the word "title." *See* 47 U.S.C. § 552(c)(1) (Supp. IV 1992); *see also* 47 U.S.C.A. § 552(c)(1) (West Supp.1994). The United States Code Service version, like the Statutes at Large, uses the term "title." 47 U.S.C.S. § 552(c)(1). We follow the general rule that in the event of a conflict between the Statutes at Large and the United States Code, the language in the Statutes at Large controls. *See United States v. Welden,* 377 U.S. 95, 98 n. 4, 84 S.Ct. 1082, 1085 n. 4, 12 L.Ed.2d 152 (1964).

**13.** On November 18, 1994, the Commission issued its *Sixth Reconsideration,* which elaborated the circumstances in which state and local negative option billing regulations might "approach" rate regulation and therefore be preempted by the 1992 Cable Act. *Implementation of Sections of the Cable Television and Consumer Protection Act of 1992,* Sixth Order on Reconsideration,

The cable petitioners contend that state laws prohibiting negative option billing are preempted by the 1992 Cable Act because they amount to prohibited rate regulation and conflict with the Commission's overall rate regulation scheme. *See* 47 U.S.C. § 543(a)(1). They also maintain that the Commission changed course without explanation by stating in its *First Reconsideration* that the federal rate scheme would preempt all state negative option billing laws that implicate re-tiering arrangements, but later determining that state and local governments have full concurrent jurisdiction over negative option billing. Because of the Commission's alleged change of course, petitioners contend that the concurrent jurisdiction decision should have, if anything, only prospective effect because, after the *First Reconsideration,* cable operators moved channels between tiers in reliance on the Commission's statement that such re-tiering would be protected from prosecution under state consumer protection laws.

Although it is unclear whether petitioners are arguing in favor of express preemption, field preemption, or conflict preemption,[14] we are unpersuaded that Congress preempted state negative option billing laws either expressly or through occupation of the field. The cable petitioners concede that Congress did not intend to "preempt the field" of consumer protection in the cable industry. Nor does the 1992 Cable Act explicitly prohibit the states from enforcing negative option billing regulations. Although § 543(a)(1) precludes state regulation of "rates," the Commission has interpreted the prohibition of negative option billing as a consumer protection provision rather than rate regulation. *Third Reconsideration,* 9 F.C.C.R. at 4361. Because the prohibition against negative option billing is directed entirely at the terms of purchase and sale other than rates, the Commission's interpretation is reasonable. That the negative option provision is not "rate regulation" is further supported by the fact that it applies both to the basic and cable programming tiers and to premium channels and a la carte programs, which are exempt from the "rate regulation" provisions of the 1992 Cable Act.[15]

The cable petitioners maintain, however, that even if § 543(f) does not expressly exempt state and local negative option billing laws, it preempts those laws insofar as they prohibit activities that are permissible under the 1992 Cable Act. We decline to reach the merits of this aspect of petitioners' preemption argument because it is not ripe for judicial review. The Commission's statement, in the abstract, that the 1992 Cable Act may or may not preempt state laws depending on whether they "approach" rate regulation is not reviewable final agency action.[16] *See*

---

Fifth Report and Order, and Seventh Notice of Proposed Rulemaking, 10 F.C.C.R. 1226 (1994) (*"Sixth Reconsideration"*). The Commission concluded that when "there is an actual conflict between federal and state law or where state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress, the state law is preempted." *Id.* at 1265. If, for example, a state consumer protection law would "require affirmative consent from subscribers before passing through external costs and inflation adjustments as permitted by" the price cap rules, the law "would undermine the federal regime governing cable rates" and would therefore be impermissible. *Id.* at 1266. Nor could a state bring action against a cable operator for moving channels to a different tier, so long as such re-tiering does not "fundamentally alter the affected tier." *Id.* at 1267.

14. As the court observed in *Jackson v. Culinary School of Washington, Ltd.*, 27 F.3d 573 (D.C.Cir. 1994), the Supreme Court has defined three ways in which federal laws and regulations preempt state and local laws:

15. *See* CONF.REP. at 65 (provision "ensures that cable operators will not be able to charge customers for tiers or packages of programming services or equipment that they do not affirmatively request as well as individually-priced programs or channels"); HOUSE REP. at 79 (noting that services offered on a per-programming, per-channel, or pay-per-view basis are not subject to rate regulation).

16. Indeed, after the *Sixth Reconsideration* it is evident that the Commission's preemption policy has not yet "crystallized" and that both the court and the agency would benefit from having the question presented in a more concrete form. *See Eagle–Picher Industries, Inc., v. U.S. E.P.A.*, 759 F.2d 905, 915 (D.C.Cir.1985); *NARUC*, 851 F.2d at 1428–29 (quoting *State Farm Mutual Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir. 1986)). The Commission stated in the *Sixth Reconsideration* that it could not determine, in the abstract, whether the 1992 Cable Act would preempt state laws interfering with a cable operator's ability to re-tier. *See Sixth Reconsidera-*

*Alascom, Inc. v. FCC,* 727 F.2d 1212, 1219 (D.C.Cir.1984); *see also FTC v. Standard Oil Co. of California,* 449 U.S. 232, 241, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1981) (agency action must be a "definitive statement of position"); *National Ass'n of Regulatory Utility Commissioners v. Department of Energy,* 851 F.2d 1424, 1428–29 (D.C.Cir.1988) (*"NARUC"*).

■ In addition, unlike "pure legal" questions, which are presumptively reviewable, *see Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), the issue of whether the 1992 Cable Act preempts state negative option billing laws involves a host of factual questions peculiar to the state law at issue in each case. *See Alascom,* 727 F.2d at 1219–20; *compare Pacific Gas & Elec. v. Energy Resources Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983). State laws will vary in their terms as well as their application. Certain state negative option billing laws may interfere with the Commission's rate scheme and therefore "approach rate regulation" while others, appearing similar on their face, may have been narrowly interpreted, thereby avoiding any potential conflict with the 1992 Cable Act. *See Jones v. Rath Packing Co.,* 430 U.S. 519, 529, 97 S.Ct. 1305, 1311, 51 L.Ed.2d 604 (1977) (determining whether state statute is consistent with federal statute "requires [the court] to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written"). As the court stated in *Alascom,* "whether a state regulation unavoidably conflicts with national interests is an issue incapable of resolution in

the abstract." 727 F.2d at 1220. Similarly, whether state law "approaches" rate regulation is a question that can only be decided after a review of the language and scope of the state statute at issue.[17]

■ Even so, while these considerations weigh against immediate review of petitioners' preemption argument, we would grant judicial review if "the hardship to the parties of withholding court consideration" were more weighty still. *Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. at 1515; *see also Consolidated Rail Corp. v. United States,* 896 F.2d 574, 577 (D.C.Cir.1990). Although the cable petitioners point to harm arising from the burden of lawsuits arising under different state laws, the Commission has made clear that it plans to preempt those state negative option billing laws that interfere with any tier changes that do not "fundamentally alter the affected tier." *Sixth Reconsideration,* 10 F.C.C.R. at 1267.[18] To the extent that changes fundamentally alter a tier, the Commission has repeatedly indicated that such changes will violate the negative option billing provision of the 1992 Cable Act. *See Rate Order,* 8 F.C.C.R. at 5908 ("restructuring will be subject to the negative option billing provision, if the restructuring effects a fundamental change in the nature of the service subscribers receive"); *Sixth Reconsideration,* 20 F.C.C.R. at 1264; *cf. Third Reconsideration,* 9 F.C.C.R. at 1209 ("operators may engage in *revenue neutral* tier restructuring without violating the negative option billing procedure") (emphasis added). Hence, because the Commission's policy protects cable operators from liability under state negative option billing laws unless their

*tion,* 10 F.C.C.R. at 1267 ("It is not possible to provide a blanket response ... in the absence of a specific set of facts to evaluate.").

17. Although prosecutions under state consumer protection laws will generally proceed in the courts (or possibly through state administrative proceedings if such exist), rather than before the Commission, the judicial forum nonetheless can afford the Commission an opportunity to develop its preemption policy in a concrete way in the context of a particular state proceeding. In *Time Warner Cable v. Doyle,* (No. 94–1894) (W.D.Wis.), for example, the Commission, at the request of the court, submitted an *amicus curiae* brief, which concluded that Wisconsin's enforcement

action would not undermine the federal cable rules and could therefore proceed against the cable operator.

18. In light of this language in the *Sixth Reconsideration,* the cable petitioners' argument that the Commission's preemption position constitutes a reversal of its earlier position must be rejected. *Compare First Reconsideration,* 9 F.C.C.R. at 1167 n. 127 ("franchising authorities may not regulate tier restructuring in a manner that is inconsistent with the 1992 Cable Act"); *with Sixth Reconsideration,* 10 F.C.C.R. at 1267 (state cannot prosecute re-tiering that does not "fundamentally alter the affected tier").

actions are also inconsistent with the negative option provision of the 1992 Cable Act, the Commission's preemption decision does not impose a hardship on operators considering programming changes. *Compare Reno v. Catholic Social Services, Inc.,* — U.S. —, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). Furthermore, a general pronouncement by this court on the validity of the Commission's as yet unapplied preemption policy can at best provide limited assistance to reviewing courts in deciding the extent to which a party's conduct may entail liability under a state law; in any event, our decision today would not be binding on other courts reviewing the question of whether the 1992 Cable Act preempts application of a particular state law to a particular defendant. In the absence of a final preemption policy applied in a factual and legal context, we are satisfied that the Commission's preemption policy will not be "felt in a concrete way by the challenging parties." *Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. at 1515. Because the hardship to parties does not outweigh the institutional interests against judicial review, we hold that petitioners' challenge is unripe.

**5. Refunds by Local Franchising Authorities.** Cable petitioners also contend that the Commission erred in allowing franchising authorities to order refunds to remedy unreasonable basic service rates. *Rate Order,* 8 F.C.C.R. at 5725; *Third Reconsideration,* 9 F.C.C.R. at 4351–52. Petitioners deem significant the fact that Congress expressly contemplated the refund remedy for the cable programming tier, 47 U.S.C. § 543(c)(1)(C), but omitted such express authorization for the basic service tier. *Id.* § 543(b)(5). *Cf. Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). But the fact that Congress provided for refunds of "unreasonable" cable programming rates does not mean that the lack of such express authorization for the basic service tier constituted an implicit rejection of refunds as an appropriate remedy. Congress's "failure to prescribe" the refund remedy for basic tier rates "could mean either that no [refunds were] contemplated by Congress, or that Congress left the choice" to the agency whether refunds were appropriate. *General Motors Corp. v. National*

*Highway Traffic Safety Admin.,* 898 F.2d 165, 170 (D.C.Cir.1990). Because the 1992 Cable Act vests broad authority in the Commission to design "procedures by which cable operators may implement and franchising authorities may enforce the regulations prescribed by the Commission" for ensuring reasonable rates of the basic tier, 47 U.S.C. § 543(b)(5)(A), there can be no doubt that Congress left to the Commission the decision of whether franchising authorities could order refunds. Consequently, because nothing in the 1992 Cable Act precludes the Commission from allowing refunds to remedy unreasonable basic rates, the Commission's decision does not violate the Act. *Cf. New England Tel. & Tel. v. FCC,* 826 F.2d 1101, 1107–08 (D.C.Cir.1987), *cert. denied,* 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989); *Lorain Journal Co. v. FCC,* 351 F.2d 824, 831 (D.C.Cir.1965), *cert. denied,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966) (Commission enjoys broad discretion in selecting remedies).

### C. Cities' Challenges

**1. Preemption of Basic Tier Agreements.** The Commission determined that the 1992 Cable Act preempts franchising authorities from regulating the number and type of channels that must be offered on the basic tier. *Rate Order,* 8 F.C.C.R. at 5738; *First Reconsideration,* 9 F.C.C.R. at 1205–06. The Commission reasoned that Congress meant to preempt such regulation when it specified the "components" of the basic service tier. Section 543(b)(7) provides:

(A) MINIMUM CONTENTS.—Each cable operator of a cable system shall provide its subscribers a separately available basic service tier to which subscription is required for access to any other tier of service. Such basic service tier shall, at a minimum, consist of the following:

(i) All signals carried in fulfillment of the ["must-carry"] requirements of [47 U.S.C. §§ 534–35].

(ii) Any public, educational, and government access ["PEG"] programming re-

quired by the franchise of the cable system to be provided to subscribers.

(iii) Any signal of any television broadcast station that is provided by the cable operator to any subscriber, except a signal which is secondarily transmitted by a satellite carrier beyond the local service area of such station.

(B) PERMITTED ADDITIONS TO BASIC TIER.—A cable operator may add additional video programming signals or services to the basic service tier....

47 U.S.C. § 543(b)(7); *see Rate Order*, 8 F.C.C.R. at 5738–39; *First Reconsideration*, 9 F.C.C.R. at 1205–09.

 We conclude, as did the Commission, that the "particular statutory language at issue, as well as the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), require preemption of franchising agreements specifying the contents of the basic service tier. *See Dole v. United Steelworkers of America*, 494 U.S. 26, 41, 110 S.Ct. 929, 937, 108 L.Ed.2d 23 (1990). Although allowing franchising authorities to enforce basic tier programming requirements would not violate any single provision of the 1992 Cable Act, "the statute, as a whole, clearly expresses Congress' intention" to leave such programming decisions to the cable operators.[19] *Id.* at 42, 110 S.Ct. at 938.

The language of the statute leaves little doubt that, apart from the programming requirements enumerated in § 543(b)(7)(A), the cable operators themselves have exclusive control over the programming on the basic service tier. First, by dividing the basic service tier components into "minimum contents" and "permitted additions," Congress defined the minimum *and maximum* of programming possibilities. In other words, § 543(b)(7)(A) describes the programming elements that all systems must offer and § 543(b)(7)(B) lists the universe of possible additions. Because neither subsection (A) nor subsection (B) includes non-PEG programs required by franchising authorities, Congress did not intend to include such programming on the basic service tier. Second, by providing that the basic tier must include *PEG programs* required by the franchise, the 1992 Cable Act suggests that franchising authorities cannot require other types of programs on the basic tier. Third, because the 1992 Cable Act specifically permits cable operators to add programs of their choice to the basic service tier, any programming limitations posed by franchise agreements would conflict with that express statutory authorization.[20] If, for example, the franchising authority forbade a cable operator from offering sports programs on its basic tier, the cable operator would be deprived of its statutory authority to "add additional video programming signals or services to the basic service tier." *Id.*[21]

In addition to the language of the statute, preemption of franchising authorities' control over the basic tier effectuates the dual regulatory framework of the 1992 Cable Act, under which franchising authorities have primary responsibility for regulating the basic service tier and the Commission regulates cable programming services. If franchising authorities were allowed to define the content of the basic tier, they could effectively force cable programming services onto the basic tier, thereby depriving the Commission of the jurisdiction that Congress clearly in-

19. *But see* 47 U.S.C. § 532 (leased access requirement).

20. The Conference Report, which describes the composition of the basic tier as "all [public access] signals required to be carried under [47 U.S.C. §§ 534 & 535], any public, educational, and governmental access programming, and any signal of any broadcast station provided by the cable operator, as well as other video programming signals *that the cable operator may choose to provide on the basic tier*," Conf.Rep. at 60, U.S.Code Cong. & Admin.News 1992, p. 1242 (emphasis added), underscores that Congress en-

visioned cable operator control over basic tier programming, subject only to the minimum statutory requirements.

21. The Cities' attempt to circumvent this language by arguing that franchise agreements do not interfere with the operator's ability to "add" channels because the operator enters into such contracts "voluntarily" is unconvincing. Programming requirements imposed by a franchising authority as a condition of obtaining a franchise are virtually equivalent to direct government regulation.

tended it to exercise. *See* 47 U.S.C. § 543(a)(2)(B). In sum, both the "language and the design of the statute as a whole" [22] demonstrate that the 1992 Cable Act preempts franchising authority control over the composition of the basic service tier, with the exception of PEG channels.

The Cities, however, point to other, still-intact sections of the pre–1992 cable statute under which franchising authorities may regulate "services" provided by cable operators as evidence that franchising authorities may control basic tier composition. They first cite 47 U.S.C. § 545(d), which provides that cable operators may rearrange programming between tiers "if the rates for all of the service tiers involved in such actions are not subject to regulation under section 543...." According to the Cities, by expressly authorizing cable operators to reorganize those tiers that are not subject to regulation, § 545(d) implies that cable operators may *not* rearrange the programming of tiers that *do* face rate regulation.

■ The Commission adequately responded to this argument in its *First Reconsideration,* concluding that § 545(d)'s "affirmative authorization" of tier rearrangement for unregulated services "is not inconsistent with the view ... that, in the regulated environment, the basic tier is to be composed of the broadcast and access channels specified in the statute and such other services 'that the cable operator may choose to provide.'" 8 F.C.C.R. at 1208. Contrary to the Cities' suggestion, the Commission's interpretation does not make superfluous § 545(d)'s affirmative authorization of tier-switching for unregulated services because

§ 543 defines certain programs that franchising authorities can require to be carried on the basic tier. Reading the two sections in harmony,[23] § 545(d) means that cable operator control over programming on non-regulated tiers may not be constrained by franchising authorities, but franchising authorities may have limited control over one aspect of basic tier programming, namely, the locally mandated PEG channels.

Nor does 47 U.S.C. § 544(b)(2), which authorizes franchising authorities to enforce franchise requirements governing "broad categories of video programming or other services," support the Cities' position. Reading this provision consistently with § 543 leads to the conclusion that franchising authorities may impose standards governing the *overall* service and programming offered by a cable system but may not (with the exception of PEG channels) dictate what programming must be offered on the basic service tier. Because the provisions from the pre–1992 cable statute are not inconsistent with the provisions of the 1992 Cable Act discussed above, they do not obscure Congress's clear intention in the 1992 Cable Act to preempt local regulation of the components of the basic tier.[24]

■ **2. Requirement of a single basic tier.** In its *First Report and Order,* the Commission, citing provisions in the 1992 Cable Act that consistently refer to "basic tier" in the singular, concluded that the statute contemplates that each cable operator must offer "only one basic tier." 8 F.C.C.R. at 5744.[25] The Cities point to an extant definition from the 1984 Act as evidence that

---

**22.** *American Scholastic TV Programming,* 46 F.3d at 1177 (citation omitted).

**23.** "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974).

**24.** Because the 1992 Cable Act clearly preempts state regulation of the basic tier, we need not reach the question whether an agency is entitled to *Chevron* deference when it acts to preempt state law in the absence of statutory authorization. *Compare Oklahoma Natural Gas v. FERC,*

28 F.3d 1281, 1284 (D.C.Cir.1994), *with California State Bd. of Optometry v. FTC,* 910 F.2d 976, 979–82 (D.C.Cir.1990).

**25.** *E.g.,* 47 U.S.C. § 543(b)(5)(D) (subscribers must "receive notice of the availability of the basic service tier"); *id.* § 543(b)(6) (cable operator must "provide 30 days' advance notice to a franchising authority of any increase proposed in the price to be charged for the basic service tier"); *id.* § 543(b)(7)(A) ("[e]ach cable operator ... shall provide its subscribers a separately available basic service tier to which subscription is required for access to any other tier of service"); *id.* § 543(b)(7)(B) ("cable operator may add ... services to the basic service tier").

the 1992 Cable Act contemplates the existence of more than one basic tier: "[T]he term 'basic cable service' means *any* service tier which includes the retransmission of local television broadcast signals." 47 U.S.C. § 522(2) (emphasis added). The court has previously interpreted the "basic cable service" definition as including all tiers of service that offer broadcast programs, even if such programming is offered on multiple tiers. *See ACLU v. FCC,* 823 F.2d 1554, 1565–66 (D.C.Cir.1987) (Commission's attempt to limit "basic cable service" to one basic tier "is at odds with [the] definition of that very term contained in the Act itself").

Despite the "basic cable service" definition, however, we conclude that the Commission's single basic tier requirement constitutes a "permissible" interpretation of the 1992 Cable Act. *See Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. We agree with the Commission that the 1992 Cable Act, by repeatedly referring to the basic tier in the singular, contemplates one basic tier. *See supra* n. 25. Moreover, after the 1992 statutory revisions, the "basic cable service" and "basic service tier" definitions can be readily reconciled. Prior to 1992, the cable statute authorized regulation *only* of basic cable services. *See* 47 U.S.C. § 543(b) (1988). The new rate regulation scheme, however, centers not around "basic cable service," but around the "basic service tier" and the "cable programming tier," terms that were modeled to suit the dual regulatory regime of the 1992 Cable Act—a regime whose structure and terms virtually require a single basic tier. Allowing a cable operator to offer multiple basic service tiers would upset the balance between local and federal regulation. The 1992 Cable Act establishes a regime in which local franchising authorities generally have jurisdiction to implement the rate rules only for the basic service tier while the Commission is solely responsible for cable programming service tiers. *Id.* § 543(a)(2) (1992). Cable operators could upset this balance if they were allowed to designate as "basic service tiers" programming tiers other than the tier provided for in § 543(b)(7) (*i.e.,* tiers that otherwise fall into the statutory definition of

"cable programming services," *id.* § 543(*l*)(2)). Considered in the context of the overall statutory scheme, we conclude that the terms "basic service tier" and "cable programming service" effectively channel "basic cable services" into a single tier, thereby modifying rather than negating the "basic cable service" definition. The Commission's interpretation is therefore permissible under *Chevron.*

**3. Settlement rules.** The Commission determined that franchising authorities exercising their regulatory authority under 47 U.S.C. § 543(b) may not settle rate disputes unless the settlement is reasonable and justified by the record created in the course of a settlement:

> [W]e affirm our intention to disallow settlement agreements that are based on factors outside the record of a rate proceeding. Permitting such settlements could potentially allow franchising authorities to bargain away subscribers' statutory protection against unreasonable rates.... Parties in a rate-setting procedure may, of course, stipulate to particular facts and even the final rate level itself, as long as the basis for each such stipulation is clearly articulated, there is some support for each stipulation in the record, and it does not circumvent our rate regulations.

*Third Reconsideration,* 9 F.C.C.R. at 4342.

▪ The Cities contend that the Commission "has no basis for summarily eliminating" the settlement option by requiring franchising authorities to develop a record of compliance with the Commission's rate rules. The Cities acknowledge, however, that the Commission "can retain the right to review agreements, just as it has the right to review rate orders generally, thus protecting against abuses." It seems obvious to us that if the Commission is to review settlements in a principled way, it must have some information about the competing claims and their resolution. The Commission's settlement rules do no more than establish a record from which the Commission can assess whether "abuses" have occurred.[26] Because

---

**26.** The Cities make the curious argument that the settlement of rate disputes is not "regulation,"

but a contractual agreement between the cable operator and the franchising authority. In enter-

the Commission's settlement rules are not contrary to the statute or arbitrary and capricious, we find the Cities' challenge unpersuasive.

**4. Requirement that franchising authorities pay for regulation with franchise fees.** Under the dual regulatory system established by Congress, franchising authorities maintain primary authority for regulating basic rates. 47 U.S.C. § 543(a)(2)(A). The 1992 Cable Act provides that the Commission may exercise jurisdiction only if it "disapproves a franchising authority's certification ... or revokes such authority's jurisdiction" because (1) the franchising authority's rate regulations conflict with the Commission's rate standards promulgated under the Act; (2) the franchising authority lacks the legal power to regulate or the personnel to administer its regulations; or (3) the authority's procedural rules do not provide for a full hearing. *Id.* § 543(a)(4), (6).

The Commission, reasoning that some franchising authorities might desire to engage in rate regulation but lack the legal power or resources to regulate on a local level, concluded that its general mandate to "ensure that the rates for the basic service tier are reasonable" empowered it to regulate basic rates upon the request of such franchising authorities. *Rate Order,* 8 F.C.C.R. at 5675–76. Rather than requiring these franchising authorities to go through a "sham" certification process to establish their lack of power or resources, the Commission decided to allow the authorities affirmatively to request Commission regulation of basic rates. When a franchising authority that collects franchise fees claims financial incapacity, however, the Commission decided to require a showing that the franchising authority cannot afford to regulate:

> [I]n providing that franchising authorities lacking the resources to regulate can affir-

matively request FCC regulation of basic cable rates, we will presume that franchising authorities receiving franchise fees have the resources to regulate. Any such franchising authority seeking to have the Commission exercise jurisdiction over basic rates will be required to rebut this presumption with evidence showing why the proceeds of the franchise fees it obtains cannot be used to cover the cost of rate regulation.

*Id.* at 5676. The Commission later clarified that the franchising authority need not dedicate all of its franchise fees to rate regulation, but must establish that "franchise fees cannot reasonably be expected to cover the present regulatory program *and* basic rate regulation." *Third Reconsideration,* 9 F.C.C.R. at 4332.

■■■■ The Cities agree that the Commission should regulate rates when justified by a franchising authority's financial inability to do so. They maintain, however, that the Commission cannot *require* franchising authorities to use their franchise fees for regulatory purposes because 47 U.S.C. § 542(i) prohibits the Commission from "regulat[ing] the amount of the franchise fees paid by a cable operator, or regulat[ing] use of funds derived from those fees." The Cities argue, in effect, that the Commission must assume regulatory jurisdiction any time a franchising authority requests it to do so because of a lack of resources.

The Commission rejected this contention on the basis that its franchise fee requirement "is not a regulation of 'the use of funds derived from such fees' within the meaning of [47 U.S.C. § 542(i) ], but it is merely a test for determining which regulatory efforts should receive the benefit of the Commission's limited resources, based on the importance placed on that regulation by the re-

---

ing into such "contracts," however, franchising authorities are clearly functioning as regulators; indeed, as consideration for such a "contract," the franchising authority agrees not to pursue unfair-rate proceedings against the operator—a power intrinsic to its regulatory role. In addition, as the Commission points out, the 1992 Cable Act gives the Commission a broad mandate to ensure "reasonable" cable rates, as determined under standards created by the Commis-

sion. It does not contain any proviso suggesting that the Commission must approve "unreasonable" rates simply because franchising authorities agree to them. Indeed, the Act suggests otherwise, by requiring the Commission to deny certification of any franchising authority that adopts rate regulations "that are not consistent with the regulations prescribed by the Commission" under the Act. 47 U.S.C. § 543(a)(4)(A).

spective franchising authority." *Third Reconsideration,* 9 F.C.C.R. at 1084. In other words, the Commission reasons that it is not directly regulating the use of franchise fees, but is instead using the existence of such fees to decide whether a franchising authority needs the Commission's support because it cannot afford to regulate itself.

■ The Commission nevertheless erred in adopting a presumption that franchising authorities receiving franchise fees have the resources to regulate because the presumption implies that the franchising authority must use any available franchise fees for purposes of rate regulation. In deciding that it had the authority to regulate basic tier rates upon the request of franchising authorities that lacked the resources to regulate, the Commission relied on its "broad mandate over basic service rates: 'The Commission shall, by regulation, ensure that the rates for the basic service tier are reasonable.'" *Rate Order,* 8 F.C.C.R. at 5675 (quoting 47 U.S.C. § 543(b)). If this provision is interpreted (as it reasonably can be) to authorize the Commission to regulate rates in franchise areas where the government cannot afford regulation, then under its mandatory terms the Commission *must* regulate in all such areas. Although the Commission could also have reasonably concluded that this provision does not in any way authorize it to step in when franchising authorities cannot afford to regulate, the provision cannot possibly support the Commission's present view that it allows the Commission to step in at its discretion. In addition, even if the Commission could consider relevant criteria in determining whether a franchising authority can afford to regulate, it could not use those criteria to accomplish indirectly what § 542(i) directly proscribes. Notwithstanding the explanation that its rule is nothing more than a test focused on making the most efficient use of limited Commission resources, *Third Reconsideration,* 9 F.C.C.R. at 4333, the effect of the Commission's test is to require that such franchise fees be dedicated to cable rate regulation purposes. A test that ties the assumption of the Commission's responsibilities to a particular use of franchise fees is inconsistent with the statute. For both of these reasons, the Commission's interpretation of 47 U.S.C. § 543(b), allowing it to assume regulation of the basic tier only upon a showing by the franchising authority that its franchise fees are insufficient to cover the costs of regulation, is impermissible.

## II.

■ **A. Regulation of single tier cable operators.** Petitioner Armstrong Holdings, Inc., filed an individual brief contesting the Commission's regulations as applied to "single-tier operators." Armstrong offers all of its subscribers a single tier rather than separate basic and cable programming tiers. According to Armstrong, the Commission's method for determining reasonable rates under the *Second Reconsideration* is arbitrary and capricious because it penalizes single-tier systems. *Implementation of Sections of the Cable · Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Second Order on Reconsideration, Fourth Report and Order, and Fifth Notice of Proposed Rulemaking, 9 F.C.C.R. 4119 (1994) (*"Second Reconsideration"*).

As the Commission notes, because Armstrong did not raise the issue before the Commission in the first instance, it is precluded from raising it on appeal. *See Florida Cellular Mobil Communications Corp. v. FCC,* 28 F.3d 191, 200–01 (D.C.Cir.1994); *Alianza Federal de Mercedes v. FCC,* 539 F.2d 732, 739 (D.C.Cir.1976). Armstrong could have raised the single tier issue either in comments or in a petition for reconsideration. *See Southern Indiana Broadcasting, Ltd. v. FCC,* 935 F.2d 1340, 1342 (D.C.Cir. 1991); 47 U.S.C. § 405(a). Although the court has recognized exceptions to this prudential "exhaustion" requirement, *see Southern Indiana,* 935 F.2d at 1342; *Office of Communication of the United Church of Christ v. FCC,* 779 F.2d 702, 706–07 (D.C.Cir. 1985), there is no occasion to apply such an exception here. Armstrong offers no reason for its failure to raise the single tier issue before the Commission, and because no other

party presented the issue, the Commission had no opportunity to address it. *Compare Office of Communication of the United Church of Christ,* 779 F.2d at 706–07.

Armstrong does not maintain that it raised the single tier issue with the Commission in comments or in a motion for reconsideration of the *Second Reconsideration* order. Instead, Armstrong points out that its officers and counsel have been engaged in discussions with the Commission "specifically to discuss the impact of the revised [rate] formula on single tier operators." Armstrong notes further that it has filed a waiver request, which is currently under consideration by the Commission. Even if the waiver request gives the Commission sufficient opportunity to consider the impact of its rules on single tier operators, the Commission has not concluded its review and the court does not have the benefit of the agency's decision and reasoned explanation.

For these reasons, the single tier issue is not properly before the court. *See Coalition for the Preservation of Hispanic Broadcasting v. FCC,* 931 F.2d 73, 76–77 (D.C.Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991); *Alianza Federal,* 539 F.2d at 739.

**B. Small Cable Business Association's Challenges.** Intervenor Small Cable Business Association ("the Association") raises the additional challenge that the *Second Reconsideration* is arbitrary and capricious because it fails to comply with the Small Business Act ("SBA")[27] and Regulatory Flexibility Act ("RFA").[28] None of the petitioners raised these arguments in their petitions for review. Because intervenors may address only issues raised by the parties, *see Illinois Bell Telephone Co. v. FCC,* 911 F.2d 776, 786 (D.C.Cir.1990), the RFA

and SBA challenges are not properly before the court. Although the court may, in its discretion, address challenges raised only by intervenors, "only in 'extraordinary cases' will we depart from our general rule." *National Association of Regulatory Utility Commissioners v. ICC,* 41 F.3d 721, 730 (D.C.Cir.1994).[29] In the instant case, the Association participated in the agency proceedings and had the opportunity to file an independent petition for review of the Commission's alleged rejection of the Association's SBA and RFA claims. Having foregone that opportunity, the Association is barred from protesting the Commission's regulations on grounds not presented by the petitioners.

The cable petitioners do mention the SBA and RFA arguments in a short two-sentence footnote in their brief. However, the footnote neither explains nor develops the statutory challenges, noting only that "[t]he intervenors' brief will discuss this issue." This terse reference in a complex regulatory case is insufficient to raise an issue unrelated to petitioners' other challenges and not discussed elsewhere in their briefs or even mentioned in their petition for review. *See Railway Labor Executives Ass'n v. United States R.R. Retirement,* 749 F.2d 856, 859 (D.C.Cir. 1984); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983); *cf. Human Development Ass'n v. NLRB,* 937 F.2d 657, 661 (D.C.Cir. 1991), *cert. denied,* 503 U.S. 950, 112 S.Ct. 1512, 117 L.Ed.2d 649 (1992). Nor is the cable petitioners' general challenge under the Administrative Procedures Act sufficient to invoke the RFA and SBA issues. *See Illinois Bell,* 911 F.2d at 786. In view of the different perspectives and concerns of cable petitioners such as Time Warner, the small business intervenor either knew or should have known that it was likely to be the only

27. 15 U.S.C. §§ 631–656.

28. 5 U.S.C. §§ 601–612.

29. *Synovus Fin. Corp. v. Board of Governors of the Fed. Reserve Sys.,* 952 F.2d 426, 433 (D.C.Cir. 1991), in which the court decided to reach an intervenor's claim not raised by petitioners, is

distinguishable because, among other things, the *Synovus* intervenor had prevailed before the agency on grounds other than the ones that it had argued, and thus had neither opportunity nor reason to petition for review. Only through an intervention motion could it preserve the arguments that it had raised with the agency. *See Synovus,* 952 F.2d at 433–34; *see also NARUC,* 41 F.3d at 730.

party to press the SBA and RFA issues before the agency, and similarly, to raise the concerns on appeal.[30] Therefore, the Association's challenges as intervenor to the Commission's regulations under the SBA and RFA are not properly before the court.[31]

**Conclusion.** Accordingly, we grant cable petitioners' petition with respect to the Commission's interpretation of the overbuild definition for effective competition, the tier buy-through provision, and the uniform rate structure provision; we grant the Cities' petition with respect to the Commission's attempt to regulate the use of franchise fees; and otherwise we deny the petitions of the cable petitioners and the Cities, except for cable petitioners' preemption contention, which we dismiss as unripe. Finally, we dismiss the petition filed by Armstrong.

RANDOLPH, Circuit Judge, dissenting in part:

I disagree with the majority's decision insofar as it rejects the Federal Communications Commission's interpretation of 47 U.S.C. § 543($l$)(1)(B).

Here is § 543($l$)(1)(B) in its entirety:

As used in this section—

(1) The term "effective competition" means that—

 &ast; &ast; &ast; &ast; &ast; &ast;

(B) the franchise area is—

(i) served by at least two unaffiliated multichannel video programming distributors each of which offers comparable video programming to at least 50 percent of the households in the franchise area; and

(ii) the number of households subscribing to programming services offered by multichannel video programming distributors other than the largest multichannel video programming distributor exceeds 15 percent of the households in the franchise area....

The immediate interpretative question is whether the "multichannel video programming distributors" in § 543($l$)(1)(B)(ii) are only those mentioned in § 543($l$)(1)(B)(i)—unaffiliated, having comparable programming, and offering it to 50 percent of households. The question is of considerable regulatory importance. Distributors are immune from the Commission's ratemaking rules if they are subject to "effective competition," if they are, in other words, in a franchise area meeting § 543($l$)(1)(B)'s description. Under the Commission's reading, effective competition does not exist unless the distributors satisfying part (i) are the ones whose subscribers add up to more than 15 percent under part (ii). The majority, on the other hand, views it as irrelevant whether the more–than–15 percent consists of distributors who satisfy (i); any distributors will do.

To appreciate the difference, consider an area where one distributor has signed up 84 percent of the households. One of its competitors offers comparable service to more than half of the households, but only 6 percent subscribe. Two other minor players in the area each have a 5 percent share. In this example, the Commission would not find "effective competition." My colleagues would, because the "multichannel video programming distributors" mentioned in (ii) are not confined to any particular category.

In examining these competing interpretations, we must first decide whether § 543($l$)(1)(B) is employing what, in the science of language and the mind, is called "co-reference." Professor Pinker gives this illustration: "Say you start talking about an individual by referring to him as *the tall blond*

---

**30.** It does not appear from the record before the court that any petitioner (other than the Association) raised the SBA and RFA issues in the proceedings before the Commission.

**31.** Although the Commission did not incorporate SBA size standards in its initial *Rate Order* or the regulations at issue here, it has since initiated a notice and comment process to determine whether to apply SBA size standards on a going-forward basis. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Fifth Order on Reconsideration and Notice of Proposed Rulemaking, 9 F.C.C.R. 5327 (1994). Thus, the Association may, at least prospectively, obtain the relief it seeks.

*man with one black shoe.* The second time you refer to him in the conversation you are likely to call him *the man;* the third time, just *him.* But the three expressions do not refer to three people or even to three ways of thinking about a single person; the second and third are just ways of saving breath." STEVEN PINKER, THE LANGUAGE INSTINCT 79–80 (1994).

Now look at § 543(*l*)(1)(B). The first thing I notice is that if the class of distributors mentioned in (ii) is in no wise limited by the class of distributors comprising (i), the statute appears rather senseless. My reasoning is this. The provision describes effective competition. There cannot be competition if all the distributors in the area are divisions of the same company. Congress knew this. That is why you cannot get beyond (i) unless the distributors are "unaffiliated." While (ii) does not expressly contain that qualifier, one would think the distributors in (ii) must also be "unaffiliated." Why? Because it would be absurd to think that when one division of a company holds an 84 percent share of the market and another division of the same company holds 16 percent, there would be "effective competition." (To simplify analysis, I have assumed that an unaffiliated distributor offered service to everyone, thereby satisfying (i), but no one subscribed.) Notice also that (i) requires that the competing distributors offer "comparable service," while (ii) does not mention this qualifier. The idea behind (i) must be that "effective competition" entails head-to-head competition. When the dominant distributor offers 50 channels and the nondominant distributor offers only 5, subsection (i) is not satisfied. The service is not "comparable." *See* 47 C.F.R. § 76.905(g). If the "comparable service" qualifier in (i) does not limit the class of distributors in (ii), the result strikes me as exceedingly odd: "effective competition" could be said to exist although those making up the 15 percent share under (ii) consisted solely of distributors offering services markedly inferior to the dominant distributor's.

If my analysis thus far is correct, the majority may be quite mistaken in saying that subsection (i) "does not limit in any way

the cable companies to be considered in aggregating subscribership" under subsection (ii). Since (i) appears to limit (ii) at least in regard to the affiliation qualification, it is plausible to suppose that it also limits (ii) regarding the 50–percent–offering qualification—that what we have here is indeed co-reference. In other words, (ii) would be interpreted as if it said: "the number of households subscribing to programming services offered by [*such* or *those* or *said,* or perhaps even just *the* ] multichannel video programming distributors other than the largest multichannel video programming distributor exceeds 15 percent of the households in the franchise area."

One way of testing the plausibility of this reading, which is the reading embraced by the Commission, is to see how others presumably familiar with the language of the statute read it. *See* A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation,* 17 HARV.J.L. & PUB.POL'Y 71, 77 (1994). The House Committee that drafted § 543(*l*)(1)(B) stated in its report that "effective competition" would exist if "at least two sources of multichannel video programming are offered to 50 percent of households and subscribed to by at least 15 percent of households." H.R.REP. NO. 628, 102d Cong., 2d Sess. 89 (1992). The Conference Committee explained that effective competition would be present if a franchise area "is served by at least two unaffiliated [distributors] offering comparable video programming to at least 50 percent of the households in the franchise area, and at least 15 percent of the households in the franchise area subscribe to the smaller of these two systems." H.R.CONF.REP. NO. 862, 102d Cong., 2d Sess. 62 (1992), U.S.Code Cong. & Admin.News 1992, p. 1244. Both statements tend to support the Commission's reading; they assume that the 15 percenter in (ii) is the same distributor as one of the 50 percenters in (i). I do not mean to place great significance on these statements. The Commission forthrightly acknowledged that

"[n]either report addresses the specific issue confronting us here: how to measure the subscribership if there is more than one competitive multichannel video programming distributor in the franchise area." *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Report and Order and Further Notice of Proposed Rulemaking, 8 F.C.C.R. 5631, 5664 n. 116 (1993).

Where does all this lead? I think the language of § 543(*l*)(1)(B) yields no firm conclusion, certainly no "plain meaning" as the majority supposes. True, unlike subsection (i), subsection (ii) contains no modifiers of "multichannel video programming distributors." But to say that the distributors of (ii) are therefore not limited to the distributors of (i) is to beg the question. Does the absence of a "such" or a "those" or a "said" or a "the" signify a difference between the classes of distributors in the two subsections, or is this merely inartful drafting? Would a congressional reader necessarily come away with the majority's view of the statute? With all due respect to my colleagues, the only honest answer to these questions is, in my view, "Maybe, and maybe not." Given this state of affairs, the Commission's plausible interpretation, an interpretation based on the sort of policy choice the Commission is entitled to make, should have carried the day.